## CONTINENTAL TIE & LUMBER CO. v. UNITED STATES.

### No. J–597.

Court of Claims.
Oct. 20, 1931.

George E. H. Goodner, of Washington, D. C., for plaintiff.

Charles B. Rugg, Asst. Atty. Gen. (Lisle A. Smith and George D. Brabson, both of Washington, D. C., on the brief), for the United States.

Before BOOTH, C. J., and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

LITTLETON, Judge.

The Federal Control Act (40 Stat. 451) provided for the taking over of railroads and the payment of just compensation for the use thereof. The Cimarron & Northwestern Railway Company was taken over December 28, 1917, and turned back June 3, 1918. The company was paid certain sums at various times, but final settlement with the Director General of Railroads was not made until 1923. In that year the company agreed to accept and the Director General paid $2,000 as settlement in full of all claims of the company arising out of federal control of said railway.

Plaintiff contends that on the accrual basis this amount was income for 1918 but that if it was not income for 1918 it was not income until 1923. Nothing took place in 1920 to fix the accrual in that year. The amount was neither earned, determined, agreed to, nor paid in that year. We are of opinion that this item was not income in 1920. Illinois Terminal Co., 5 B. T. A. 15; Cincinnati, Findlay & Fort Wayne Railway Co., 5 B. T. A. 108; Virginia Carolina Securities Corporation, 6 B. T. A. 84; New Orleans, Texas & Mexico Railway Co., 6 B. T. A. 436; Great Northern Railway Co., 8 B. T. A. 225; Chicago, Rock Island & Pacific Ry. Co., 13 B. T. A. 988; Old Dominion Steamship Co., 16 B. T. A. 264; Kansas City Southern Ry. Co., 16 B. T. A. 665.

With reference to the second item of $25,228.35 paid to the plaintiff by the United States under section 204 of the Transportation Act of 1920 (49 USCA § 73) to make good the deficit of the plaintiff in its operating income for the guaranty period, January 1, 1918, to February 29, 1920, plaintiff contends that this payment was not income within the meaning of the taxing act but was a gratuity or bounty; that it did not arise through any legal obligation of the government to pay; that it did not arise through contract; and that it was not a gain derived from capital or labor and was not determined, fixed, or allowed until 1923.

Section 204 of the Transportation Act, approved February 28, 1920, 41 Stat. 456, 460 (49 USCA § 73), entitled "Reimbursement of deficits during Federal control," provided:

"Sec. 204. (a) When used in this section—

"The term 'carrier' means a carrier by railroad which, during any part of the period of Federal control, engaged as a common carrier in general transportation, and competed for traffic, or connected, with a railroad under Federal control, and which sustained a deficit in its railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation; but does not include any street or interurban electric railway which has as its principal source of operating revenue urban, suburban, or interurban passenger traffic or sale of power, heat, and light, or both; and

"The term 'test period' means the three years ending June 30, 1917.

"(b) For the purposes of this section—

"Railway operating income or any deficit therein for the period of Federal control shall be computed in a manner similar to that provided in section 209 with respect to such income or deficit for the guaranty period; and

"Railway operating income or any deficit therein for the test period shall be computed in the manner provided in section 1 of the Federal Control Act.

"(c) As soon as practicable after March 1, 1920, the Commission shall ascertain for every carrier, for every month of the period of Federal control during which its railroad or system of transportation was not under

Federal operation, its deficit in railway operating income, if any, and its railway operating income, if any, (hereinafter called 'Federal control return'), and the average of its deficit in railway operating income, if any, and of its railway operating income, if any, for the three corresponding months of the test period taken together, (hereinafter called 'test period return'): Provided, That 'test period return,' in the case of a carrier which operated its railroad or system of transportation for at least one year during, but not for the whole of, the test period, means its railway operating income, or the deficit therein, for the corresponding month during the test period, or the average thereof for the corresponding months during the test period taken together, during which the carrier operated its railroad or system of transportation.

"(d) For every month of the period of Federal control during which the railroad or system of transportation of the carrier was not under Federal operation, the Commission shall then ascertain (1) the difference between its Federal control return, if a deficit, and its test period return, if a smaller deficit, or (2) the difference between its test period return, if an income, and its Federal control return, if a smaller income, or (3) the sum of its Federal control return, if a deficit, plus its test period return, if an income. The sum of such amounts shall be credited to the carrier.

"(e) For every such month the Commission shall then ascertain (1) the difference between the carrier's Federal control return, if an income, and its test period return, if a smaller income, or (2) the difference between its test period return, if a deficit, and its Federal control return, if a smaller deficit, or (3) the sum of its Federal control return, if an income, plus its test period return, if a deficit. The sum of such amounts shall be credited to the United States.

"(f) If the sum of the amounts so credited to the carrier under subdivision (d) exceeds the sum of the amounts so credited to the United States under subdivision (e), the difference shall be payable to the carrier. In the case of a carrier which operated its railroad or system of transportation for less than a year during, or for none of, the test period, the foregoing computations shall not be used, but there shall be payable to such carrier its deficit in railway operating income for that portion (as a whole) of the period of Federal control during which it operated its own railroad or system of transportation.

"(g) The Commission shall promptly certify to the Secretary of the Treasury the several amounts payable to carriers under paragraph (f). The Secretary of the Treasury is hereby authorized and directed thereupon to draw warrants in favor of each such carrier upon the Treasury of the United States for the amount shown in such certificate as payable thereto. An amount sufficient to pay such warrants is hereby appropriated out of any money in the Treasury not otherwise appropriated."

The foregoing section was enacted for the benefit of only those railroads engaged as common carriers which had connection with and competed with railroads under federal control. The benefits of the section were designed not for all such carriers but only those which suffered a genuine deficit in operating income by reason of traffic diversions and other practices of the Railroad Administration. The general intent of the section was to afford relief to carriers which through their service were entitled by the public interest to preservation as a part of the transportation system of the country and the specific purpose of the section was to reimburse such railways on account of deficits in their net railway operating income. The legislative history shows that it was the intention of Congress to extend certain aid to railways not under federal control consisting largely of so-called short lines, in recognition not only of their financial necessities but of injury to them through federal control and operation of lines with which they connected or competed during the federal control period.

To sustain a claim under this section a railroad must not only have engaged as a common carrier in general transportation but must have competed for traffic or connected with a railroad under federal control.[1]

Section 204 differs from section 209 (49 USCA § 77) considered by the court in Texas & Pacific Railway Co. v. United States (Ct. Cl.) 52 F.(2d) 1040, decided this date, in that it relates to reimbursements of deficits of railroads, during any part of the period of federal control, engaged as a common carrier in general transportation, and competed for traffic, or connected, with a railroad under federal control, which sustained a deficit in its railway-operating income for that por-

[1] Little Cottonwood Company, 65 I. C. C. 189; Mercer Valley R. R. Co., 76 I. C. C. 55; United States & C. R. Co., 76 I. C. C. 455: Manitou & Pike's Peak Railway Company, 94 I. C. C. 767; Bingham & G. Railway Co., 99 I. C. C. 724; Rural Valley Railroad Company, 131 I. C. C. 509; Glenfield & Western Railroad Company, 150 I. C. C. 39.

tion, as a whole, of the period of federal control in which it operated its own railroad or system of transportation, but we think the same reasons which lead to the conclusion that amounts received by railroads from the Government pursuant to section 209 of the Transportation Act are income subject to taxation under the revenue acts apply to amounts paid by the government under section 204. We find no reason to assume that Congress intended section 209 as a compensation provision and section 204 as a gratuity or bounty provision. Although in section 204 there is absent the contractual relationship between the carrier and the government found in section 209, this does not, in our opinion, warrant the conclusion that section 204 was designed to confer a gift or gratuity upon railroads since any amount payable thereunder arose from the operation of the railroad by the carrier and the use of capital and labor. We think the receipt by the carrier of an amount sufficient to reimburse it for a deficit in railway-operating income computed in accordance with the provisions of section 204 of the Transportation Act falls within the definition of income under the Sixteenth Amendment and the Revenue Act of 1918 (40 Stat. 1057) as defined by the Supreme Court. The entire phraseology of the transportation act is directed toward the idea of compensation and a consideration of its history and purpose shows that section 204 was designed to reimburse or compensate particular carriers which had suffered by reason of the policies and practices of the Railroad Administration through traffic diversions and divisions.

█ We think there is no merit in the contention of the plaintiff that the amount of $25,228.35 paid to the Cimarron & Northwestern Railway Company by the United States should not be included in income until determined and paid in 1923. The amount represented a deficit in railway operating income for that portion, as a whole, of the period of federal control during which the Cimarron & Northwestern Railway Company operated its own railroad or system of transportation. It kept its books on the accrual basis. Prior to the enactment of the Transportation Act on February 28, 1920 (41 Stat. 456), no right in the Cimarron & Northwestern Railway Company to the receipt of this amount existed. The right to receipt accrued upon the termination of federal control on March 1, 1920. All that remained to be done was to compute the deficit in accordance with the provisions of the act. The accrual system of accounting, as it has always been applied, requires time for computation and adjustment. The plaintiff had previous knowledge and experience as to the test period whereby the railway operating income and deficit were to be measured and the transportation act was enacted in ample time for the necessary computations to have been made or reasonably estimated for the purpose of accrual in 1920. No contention is made as to any question of dispute or difference between the parties which might have made an estimate or accrual of the claim of the Cimarron & Northwestern Railway Company impossible. There appears to have been no substantial dispute between the plaintiff and the Interstate Commerce Commission as to its claim. The authority of the commission consisted in a review and audit of plaintiff's books for the purpose of determining its operating deficit as compared with similar accounts during the test period. It is true that there was considerable delay in the payment of plaintiff's claim but that was due to the failure of plaintiff to report or to submit a complete statement of facts and full information to the commission in response to the circular issued by it.

Plaintiff relies upon Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 203, 74 L. Ed. 538. This case held simply that a taxpayer may not set up a reserve to take care of its own breach of contract where it denies all liability therefor. There was no breach of contract here, no dispute of fact or of law between the plaintiff and the commission, or between the plaintiff and any branch of the government. Furthermore, the plaintiff in American Code Company was not a common carrier subject to interstate commerce regulations which prescribe its method of accounting. In the American Code Company Case, supra, the court stated: "It may be assumed that, since the company kept its books on the accrual basis, the mere fact that the exact amount of the liability had not been definitely fixed in 1919 would not prevent the deduction, as a loss in that year, of the amount later paid. But here there are other obstacles. Obviously, the mere refusal to perform a contract does not justify the deduction, as a loss, of the anticipated damages. * * * And, when liability is contested, the institution of a suit does not, of itself, create certainty of loss." We, therefore, conclude that the plaintiff and its affiliated companies are not entitled to exclude from consolidated income for 1920 the amount of the operating deficit of the Cimarron & North-

western Railway Company for which that company received reimbursement from the United States under section 204 of the Transportation Act of 1920.

Judgment will be entered in favor of plaintiff for $200 with interest, as provided by law. It is so ordered.