# UNITED STATES *v.* CHICAGO, BURLINGTON & QUINCY RAILROAD CO.

No. 72–90. Argued February 26, 1973—Decided June 4, 1973

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and REHNQUIST,

JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 416. STEWART, J., filed a dissenting opinion, in which DOUGLAS, J., joined, *post*, p. 417. POWELL, J., took no part in the consideration or decision of the case.

*Richard B. Stone* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Acting Assistant Attorney General Ugast, Meyer Rothwacks,* and *Grant W. Wiprud.*

*Richard J. Schreiber* argued the cause for respondent. With him on the brief was *Richard T. Cubbage.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The issue in this federal income tax case is whether the respondent, Chicago, Burlington & Quincy Railroad Company (CB&Q), an interstate common carrier railroad, may depreciate the cost of certain facilities paid for prior to June 22, 1954, not by it or by its shareholders, but from public funds.

Starting about 1930, CB&Q entered into a series of contracts with various Midwestern States. By these agreements the States were to fund some or all of the costs of construction of specified improvements, and the railroad apparently was to bear, at least in part, the costs of maintenance and replacement of the improvements once they had been installed. In 1933, as part of the program of the National Industrial Recovery Act, 48 Stat. 195, Congress authorized federal reimbursement to the States of the shares of the costs the States incurred in the construction of those improvements that inured to the benefit of public safety and improved highway traffic control.[1] In 1944 Congress went further and authorized reimbursement, with stated limitations, to the States for the entire cost of the improvements, subject to the con-

---

[1] National Industrial Recovery Act, § 204 (a) (1), 48 Stat. 203.

dition that a railroad that received a benefit from a facility so constructed was liable to the Government for up to 10% of the cost of the project pro rata in relation to the benefit received by the railroad.[2]

Under these programs CB&Q received, at public expense, highway undercrossings and overcrossings having a cost of $1,538,543; crossing signals, signs, and floodlights having a cost of $548,877; and jetties and bridges having a cost of $58,721.[3] These improvements, aggregating $2,146,141, were carried on the railroad's books as capital assets even though most of the agreements between CB&Q and the several States did not expressly convey title to the railroad.

CB&Q instituted a timely suit in the Court of Claims alleging, among other things, that it had overpaid its 1955 federal income tax because it had failed to assert, as a deduction on its return as filed, allowable depreciation on the subsidized assets.[4] By a 4-to-3 decision on this issue (only one of several in the case), the Court of Claims concluded that, under § 167 of the Internal Revenue Code of 1954, 26 U. S. C. § 167, CB&Q was entitled to the depreciation deduction it claimed. This was on the theory that the subsidies qualified as contributions to the railroad's capital under §§ 362 and 1052 (c) of that

---

[2] Federal-Aid Highway Act of 1944, § 5, 58 Stat. 840.

[3] The Court of Claims, both the majority and dissenters, asserted, and indeed found, that the $1,538,543 figure related to highway undercrossings and overcrossings. 197 Ct. Cl. 264, 271–272, 325, 455 F. 2d 993, 997–998 (1972). CB&Q, in its Brief, p. 3, and in oral argument, Tr. of Oral Arg. 25, claims that this figure has to do only with railroad bridges and that the assets sought to be depreciated relate only to railroad use. According to CB&Q, no facilities directly related to highway use are involved. Inasmuch as the resolution of this factual issue would not affect the result we reach, it need not be resolved.

[4] The parties are in agreement as to what the adjusted bases of the assets in question would be, and as to the applicable rates of depreciation, if depreciation for tax purposes is allowable at all.

Code, 26 U. S. C. §§ 362 and 1052 (c), and under § 113 (a)(8) of the Internal Revenue Code of 1939.

In arriving at this conclusion, the Court of Claims majority relied on *Brown Shoe Co.* v. *Commissioner,* 339 U. S. 583 (1950), and reasoned that, even though the governmental payments for the facilities may not have been intended as contributions to the railroad's capital, the "principal purpose" being, instead, "to benefit the community-at-large," 197 Ct. Cl., at 276, 455 F. 2d, at 1000, the facilities did in fact enlarge the railroad's working capital, were used in its business, and produced economic benefits for it, thereby qualifying as contributions to its capital under the cited section of the 1939 Code. The three dissenting judges disagreed with this interpretation of *Brown Shoe,* and, instead, relied on *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98 (1943). They concluded that the critical features were the donor's attitude, purpose, and intent, and that, with governmental payments, there could be no intention to confer a benefit upon CB&Q. Instead, as the findings revealed,[5] the intention was to expedite traffic flow and to improve public safety at highway-railroad crossings. 197 Ct. Cl., at 315, 320, 455 F. 2d, at 1023, 1026.

Because the Court of Claims decision apparently would afford a precedent for the tax treatment of substantial sums,[6] we granted certiorari. 409 U. S. 947.

---

[5] The Trial Commissioner and the Court of Claims made the following finding of fact:

"9. The facilities noted in finding 7 were constructed primarily for the benefit of the public to improve safety and to expedite highway traffic flow. Plaintiff [CB&Q], however, received benefits from the facilities, among others, probable lower accident rates, reduced expenses of operating crossing facilities, and, where permitted, higher train speed limits, all of which permitted plaintiff to function more efficiently and presumably less expensively." 197 Ct. Cl., at 326–327.

[6] The Solicitor General asserts, Pet. for Cert. 15–16, that $623,000,000 in federal funds were paid out for projects and im-

## I

Section 23 (*l*) of the 1939 Code and its successor, § 167 (a) of the 1954 Code, 26 U. S. C. § 167 (a), allow a taxpayer "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear . . . of property used in the trade or business." In the usual situation the taxpayer himself incurs cost in acquiring the assets as to which the depreciation deduction is asserted.[7] But there are other and different situations formally recognized in the governing tax statutes. A familiar example is gift property.[8] Another is property acquired by a cor-

provements at railroad-highway grade crossings alone between 1934 and 1954. See U. S. Department of Transportation, Report to Congress: Railroad-Highway Safety, Part I: A Comprehensive Statement of the Problem 38 (1971). The Commissioner of Internal Revenue estimates that, taking into account grants of this kind to railroads and federal grants to utility companies, depreciation on property with asserted cost bases between a half billion and one billion dollars is dependent upon the resolution of this issue and is still litigable. Pet. for Cert. 16.

[7] Section 113 (a) of the 1939 Code and § 1012 of the 1954 Code, 26 U. S. C. § 1012, state the general rule that the "basis of property shall be the cost of such property."

[8] Section 113 (a) (2) of the 1939 Code provides that with respect to "property . . . acquired by gift after December 31, 1920, the basis shall be the same as it would be in the hands of the donor or the last preceding owner by whom it was not acquired by gift, except . . . ." This provision was carried over into § 1015 (a) of the 1954 Code, 26 U. S. C. § 1015 (a). The language of § 362 (c) of the 1954 Code, to the effect that the basis of a nonshareholder's contribution made on or after June 22, 1954, to the capital of a corporation shall be zero in the hands of the transferee, has been said not to affect the availability of a carryover basis with respect to gifts. See H. R. Rep. No. 1337, 83d Cong., 2d Sess., A128 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess., 272 (1954); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 3.14, pp. 3–51 and n. 81 (3d ed. 1971); 3A J. Mertens, Law of Federal Income Taxation § 21.134 (1968 rev.).

poration from its shareholders as paid-in surplus or as a contribution to capital.[9] Another, and the one that is pertinent here, is covered by § 113 (a)(8) [10] of the 1939 Code and by the contrasting provisions of §§ 362 (a) and (c) of the 1954 Code, 26 U. S. C. §§ 362 (a) and (c).[11]

[9] Section 113 (a)(8) of the 1939 Code; § 362 (a) of the 1954 Code, 26 U. S. C. § 362 (a).

[10] "§ 113. Adjusted basis for determining gain or loss.

"(a) Basis (unadjusted) of property.

"The basis of property shall be the cost of such property; except that—

.     .     .     .     .

"(8) Property acquired by issuance of stock or as paid-in surplus.

"If the property was acquired after December 31, 1920, by a corporation—

"(A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

[11] "§ 362. Basis to corporations.

"(a) Property acquired by issuance of stock or as paid-in surplus.

"If property was acquired on or after June 22, 1954, by a corporation—

"(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

"(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

.     .     .     .     .

"(c) Special rule for certain contributions to capital.

"(1) Property other than money.

This concerns a contribution to capital by a nonshareholder. See Treas. Reg. 111, § 29.113 (a)(8)–1 (1943). Under §§ 113 (a)(8) and 114 (a) of the earlier Code, the nonshareholder-contributed asset in the hands of the receiving corporation had the same basis, subject to adjustment, for depreciation purposes as it had in the hands of the transferor; under the 1954 Code, however, its basis for the transferee is zero.

Pertinent to all this is the Court's decision in *Edwards* v. *Cuba R. Co.*, 268 U. S. 628 (1925). The Court there held that subsidies granted by the Cuban Government to a railroad to promote construction in Cuba "were not profits or gains from the use or operation of the railroad," and did not constitute income to the receiving corporation. *Id.*, at 633. The holding in *Edwards*, taken with § 113 (a)(8) of the 1939 Code, produced a seemingly anomalous result, for it meant that a corporate taxpayer receiving property from a nonshareholder as a contribution to capital not only received the property free from income tax but was allowed to assert a deduction for depreciation on the asset so received tax free. This result also ensued under the Court's holding in *Brown Shoe* and led to the enactment of the zero-basis

"Notwithstanding subsection (a)(2), if property other than money—

"(A) is acquired by a corporation, on or after June 22, 1954, as a contribution to capital, and

"(B) is not contributed by a shareholder as such, then the basis of such property shall be zero.

"(2) Money.

"Notwithstanding subsection (a)(2), if money—

"(A) is received by a corporation, on or after June 22, 1954, as a contribution to capital, and

"(B) is not contributed by a shareholder as such, then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution."

provision, referred to above, in § 362 (c) of the 1954 Code, 26 U. S. C. § 362 (c). *Veterans Foundation* v. *Commissioner,* 317 F. 2d 456, 458 (CA10 1963).

CB&Q argues that this very result should follow here. It is said that the railroad received no taxable income and incurred no income tax liability when it received, at governmental expense prior to June 22, 1954, the facilities as to which CB&Q now asserts depreciation. And, in providing the facilities, CB&Q argues, the Government intended to make a contribution to the railroad's capital, within the meaning of § 113 (a) (8), thereby permitting CB&Q to depreciate the Government's cost in the assets. Whether the governmental subsidies qualified as income to the railroad is an issue not raised in this case, and we intimate no opinion with respect to it. The United States, however, asserts that the subsidies did not constitute a "contribution to capital" under § 113 (a) (8), and that, accordingly, the transferee railroad's tax basis is zero and no depreciation deduction is available.

Our inquiry, therefore, is a narrow one: whether the nonshareholder payment in this case constituted a "contribution to capital," within the meaning of § 113 (a) (8). Because both *Detroit Edison* and *Brown Shoe* bear upon the issue, we turn to those two decisions.

## II

*Detroit Edison* concerned customers' payments to a utility for the estimated costs of construction of service facilities (primary power lines) that the utility otherwise was not obligated to provide. For its tax years 1936 and 1937, to which the Revenue Act of 1936, 49 Stat. 1648, applied, the utility claimed the full cost of the facilities in its base for computing depreciation. The Commissioner disallowed, for depreciation purposes, that portion of the cost paid by customers and not refundable. The Board of Tax Appeals, 45 B. T. A. 358 (1941), and the

Court of Appeals, 131 F. 2d 619 (CA6 1942), sustained the Commissioner. This Court affirmed.

Mr. Justice Jackson, speaking for a unanimous Court (the Chief Justice not participating), observed, "The end and purpose of it all [depreciation] is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." 319 U. S., at 101. The statute, § 113 (a) of the 1936 Act, it was said, "means . . . cost to the taxpayer," even though the property "may have a cost history quite different from its cost to the taxpayer." Also, the "taxpayer's outlay is the measure of his recoupment through depreciation accruals." 319 U. S., at 102. The utility's attempt to avoid this result by its contention that the payments were gifts or contributions to its capital, and entitled to the transferors' bases, was rejected.

> "It is enough to say that it overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. The transaction neither in form nor in substance bore such a semblance.
>
> "The payments were to the customer the price of the service. . . . They have not been taxed as income. . . . But it does not follow that the Company must be permitted to recoup through untaxed depreciation accruals on investment it has refused to make." *Id.,* at 102–103.

*Detroit Edison,* by itself, would appear almost to foreclose CB&Q's claims here, for there is an obvious parallel between the customers' payment for the utility service facilities in *Detroit Edison,* and the governmental payments for improvements to the railroad's service facilities in the case before us.

But *Detroit Edison* was not the last word. *Brown Shoe* was decided seven years later, and the opposite tax result was reached by an 8–1 vote of the Court, with Mr. Justice Black in dissent without opinion.

*Brown Shoe* concerned a corporate taxpayer's excess profits tax, under the Second Revenue Act of 1940, 54 Stat. 974, as amended, for its fiscal years 1942 and 1943. Community groups paid cash or transferred property to the taxpayer as an inducement for the location or expansion of factory operations in their communities. Contracts were entered into, and in each instance the taxpayer obligated itself to locate or enlarge a facility in the community and to operate it for at least a minimum term. The value of the payments and transfers was the focus of the controversy between the taxpayer and the Commissioner, for depreciation on the transferred assets was claimed and their inclusion in equity invested capital was asserted. The Tax Court overruled the Commissioner's disallowance with respect to the acquisitions paid for with cash, but sustained the Commissioner with respect to buildings transferred. 10 T. C. 291 (1948). The Court of Appeals upheld the Commissioner on both items. 175 F. 2d 305 (CA8 1949). This Court reversed.

Mr. Justice Clark, writing the opinion for the majority of the Court, concluded that the assets transferred by the community groups to the taxpayer were contributions to capital, within the meaning of § 113 (a)(8) of the 1939 Code. The Court noted that in time they would wear out and, if the taxpayer continued in business, the physical plant eventually would have to be replaced. *Detroit Edison* was cited and recognized, but was considered not to be controlling. In *Brown Shoe* there were "neither customers nor payments for service," and therefore the Court "may infer a different purpose in the transactions between petitioner and the community groups." 339 U. S., at 591. The only expectation of the groups

was that "such contributions might prove advantageous to the community at large." Thus, it was said, "the transfers manifested a definite purpose to enlarge the working capital of the company." *Ibid.*

The Court thus professed to distinguish and not at all to overrule *Detroit Edison*. It did so on an analysis of the purposes behind the respective transfers in the two cases. Where the facts were such that the transferors could not be regarded as having intended to make contributions to the corporation, as in *Detroit Edison*, the assets transferred were not depreciable. But where the transfers were made with the purpose, not of receiving direct service or recompense, but only of obtaining advantage for the general community, as in *Brown Shoe*, the result was a contribution to capital.

## III

It seems fair to say that neither in *Detroit Edison* nor in *Brown Shoe* did the Court focus upon the use to which the assets transferred were applied, or upon the economic and business consequences for the transferee corporation. Instead, the Court stressed the intent or motive of the transferor and determined the tax character of the transaction by that intent or motive. Thus, the decisional distinction between *Detroit Edison* and *Brown Shoe* rested upon the nature of the benefit to the transferor, rather than to the transferee, and upon whether that benefit was direct or indirect, specific or general, certain or speculative.[12] These factors, of course, are simply indicia of the transferor's intent or motive.

---

[12] See, for example, *Teleservice Co.* v. *Commissioner,* 254 F. 2d 105 (CA3 1958), cert. denied, 357 U. S. 919 (1959); *United Grocers, Ltd.* v. *United States,* 308 F. 2d 634 (CA9 1962). There is support in the legislative history of § 118 of the 1954 Code, 26 U. S. C. § 118, providing for the exclusion from gross income of "any contribution to the capital of the taxpayer," for the indirect benefit—prepayment-

That this line of inquiry, and these distinctions, have relatively little to do with the economic and business consequences of the transaction seems self-evident.[13]  In both cases the assets transferred were actually used in the transferee's trade or business for the production of income.  In neither case did the transferee provide the investment for the assets sought to be depreciated.  Yet in both cases, the assets in question were transferred for a consideration pursuant to an agreement.  If, at first glance, *Detroit Edison* and *Brown Shoe* seem somewhat inconsistent, they may be reconciled, and indeed must be, on the ground that in *Detroit Edison* the transferor intended no contribution to the transferee's capital, whereas in *Brown Shoe* the transferors did have that intent.

The statutory phrase "contribution to capital" is nowhere expressly defined in either the 1939 Code or the 1954 Code, and our prior decisions provide only limited guidance as to its precise meaning.  *Detroit Edison* might be said to be only a holding that a payment for services is not a contribution to capital.  *Brown Shoe* sheds little additional light, for the Court stated only that because the community payments were not compensation for specific services rendered, and did not con-

for-future-services distinction.  H. R. Rep. No. 1337, 83d Cong., 2d Sess., 17 (1954).

[13] The distinctions wrought by *Detroit Edison* and *Brown Shoe* have been the subject of scholarly criticism.  See, for example, Note, Taxation of Nonshareholder Contributions to Corporate Capital, 82 Harv. L. Rev. 619 (1969); Landis, Contributions to Capital of Corporations, 24 Tax L. Rev. 241 (1969); Note, Tax Consequences of Non-Shareholder Contributions to Corporate Capital, 66 Yale L. J. 1085 (1957); Freeman & Speiller, Tax Consequences of Subsidies to Induce Business Location, 9 Tax. L. Rev. 255 (1954).  In the article last cited the authors suggest that *Detroit Edison* and *Brown Shoe* are irreconcilable, the latter in effect overruling the former.  *Id.*, at 262.  See also The Supreme Court, 1949 Term, 64 Harv. L. Rev. 114, 149–151 (1950).

stitute gifts, they must have been made in order to enlarge the working capital of the company. 339 U. S., at 591.

But other characteristics of a contribution to capital are implicit in the two cases and become apparent when viewed in the light of the facts presently before us. In *Brown Shoe*, for example, the contributed funds were intended to benefit not only the transferors but the transferee as well, for the assets were put to immediate use by the taxpayer for the generation of additional income. Without benefit to the taxpayer, the agreement certainly would not have been made. Perhaps to some extent this was true in *Detroit Edison;* that taxpayer, however, was a public utility, and the anticipated revenue from the service lines to the customers would not have warranted the investment by the utility itself. 319 U. S., at 99. Its benefit, therefore, was marginal.

We can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes. It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.

By this measure, the assets with which this case is concerned clearly do not qualify as contributions to capital. Although the assets were not payments for specific, quantifiable services performed by CB&Q for the Government as a customer, other characteristics of

the transaction lead us to the conclusion that, despite this, the assets did not qualify as contributions to capital. The facilities were not in any real sense bargained for by CB&Q. Indeed, except for the orders by state commissions and the governmental subsidies, the facilities most likely would not have been constructed at all.[14] See *Nashville, C. & St. L. R. Co.* v. *Walters,* 294 U. S. 405, 421–424 (1935). The transaction in substance was unilateral: CB&Q would accept the facilities if the Government would require their construction and would pay for them. Any incremental economic benefit to CB&Q from the facilities was marginal; its extent and importance were indicated and accounted for by the requirement that the railroad pay not to exceed 10% of the cost in relation to its own benefit.[15] The facilities were peripheral to its business and did not materially contribute to the production of further income by the railroad. They simply replaced existing facilities or provided new, better, and safer ones where none otherwise would have been deemed necessary. As the Court of Claims found, the facilities were constructed "primarily for the benefit of the public to improve safety and to expedite highway traffic flow," [16] and the need of the railroad for capital funds was not considered, 197 Ct. Cl., at 326. While some incremental benefit from lower accident rates, from reduced expenses of operating crossing facilities, and from possibly higher train speed might have resulted, these were incidental and insubstantial in relation to the value now sought to be depreciated, and they

[14] Counsel for CB&Q stated at oral argument that the railroad was under a "preexisting legal obligation to construct these facilities" that were funded by the governmental subsidies. Tr. of Oral Arg. 30, 35–36.

[15] The Government does not challenge the CB&Q's right to depreciate those portions of a facility for which it was required to pay.

[16] See n. 5, *supra.*

were presumably considered in computing the railroad's maximum 10% liability under the Act. In our view, no substantial incremental benefit in terms of the production of income was foreseeable or taken into consideration at the time the facilities were transferred. Accordingly, no contribution to capital was effected.

CB&Q nevertheless contends that it is entitled to depreciate the facilities because of its obligation to maintain and replace them. Whatever may be the desirability of creating a depreciation reserve under these circumstances, as a matter of good business and accounting practice, the answer is, as Judge Davis of the Court of Claims observed in dissent, 197 Ct. Cl., at 318, 455 F. 2d, at 1025, "Depreciation reflects the cost of an existing capital asset, not the cost of a potential replacement." *Reisinger* v. *Commissioner,* 144 F. 2d 475, 478 (CA2 1944). See *United States* v. *Ludey,* 274 U. S. 295, 300–301 (1927); *Weiss* v. *Wiener,* 279 U. S. 333, 335–336 (1929); *Helvering* v. *Lazarus & Co.,* 308 U. S. 252, 254 (1939); *Massey Motors* v. *United States,* 364 U. S. 92 (1960); *Fribourg Nav. Co.* v. *Commissioner,* 383 U. S. 272 (1966).

We conclude that the governmental subsidies did not constitute contributions to CB&Q's capital, within the meaning of § 113 (a)(8) of the 1939 Code; that the assets in question in the hands of CB&Q have a zero basis, under §§ 113 and 114 of that Code and § 1052 (c) of the 1954 Code, 26 U. S. C. § 1052 (c); and that CB&Q is therefore precluded from claiming a depreciation allowance with respect to those assets.[17] The judgment of the

---

[17] The Government has argued, in the alternative, that, by virtue of a "terms letter" agreement entered into by CB&Q and the Commissioner with respect to a change in the railroad's accounting method from retirement to straight-line depreciation, CB&Q irrevocably agreed to exclude donated property, or contributions or grants in aid of construction from any source, from its depreciation base. Be-

Court of Claims on this issue is reversed and the case is remanded for further proceedings.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

While I join the dissent of MR. JUSTICE STEWART, I add a few words. Funds were contributed by the States and by the Federal Government to respondent for the construction of highway overpasses and underpasses and for grade-crossing protection equipment. While the Government provided most of the funds, the respondent did most of the construction work—all as found by the Court of Claims. 197 Ct. Cl. 264, 271, 455 F. 2d 993, 997–998.

This case is not controlled by *Detroit Edison Co.* v. *Commissioner,* 319 U. S. 98, as MR. JUSTICE STEWART says, for there the advances were made by customers of a utility as part of "the price of the service." *Id.,* at 103. Here, however, the situation was different. As the Court of Claims found:

"[U]nder all the agreements, plaintiff was obligated to maintain and replace as necessary, at its own expense, facilities originally built. The facilities were constructed primarily for the benefit of the public to improve safety and to expedite motor-vehicle traffic flow. The record shows, however, that plaintiff received economic benefits from the facilities, *e. g.,* probable lower accident rates, reduced expenses of operating crossing equipment and, where

cause of our conclusion that the governmental payments did not qualify as contributions to capital, we need not determine whether the "terms letter" agreement barred CB&Q from claiming depreciation on the assets in question.

permitted, higher train speed limits. Plaintiff also received intangible benefits, *e. g.,* goodwill from the community-at-large, which was to plaintiff's long-term economic advantage." 197 Ct. Cl., at 272, 455 F. 2d, at 998.

The case is therefore on all fours with *Brown Shoe Co.* v. *Commissioner,* 339 U. S. 583. In distinguishing *Detroit Edison* we said:

"Since in this case there are neither customers nor payments for service, we may infer a different purpose in the transactions between petitioner and the community groups. The contributions to petitioner were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large. Under these circumstances the transfers manifested a definite purpose to enlarge the working capital of the company." *Id.,* at 591.

I would affirm the judgment of the Court of Claims.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS joins, dissenting.

This case involves the depreciation of certain railroad facilities constructed with public funds prior to June 22, 1954. The precise question before the Court is whether those facilities constituted "contributions to capital" within the meaning of § 113 (a) (8) (B) of the Internal Revenue Code of 1939.

Beginning in the early 1930's, various state governments entered into agreements with the respondent railroad for the construction of highway overpasses and underpasses at highway-railroad intersections, and construction of grade-crossing protection equipment such as

flashing-light signals and automatic gates. The agreements generally provided that the States would pay 50% or more of the total cost, and subsequently Congress authorized the Federal Government to assume the State's share of the construction costs. See National Industrial Recovery Act § 204 (a), 48 Stat. 203. Under the Federal-Aid Highway Act of 1944, § 5, 58 Stat. 840, the Federal Government reimbursed the States for the entire cost of the highway-railroad crossing projects, subject to payment by the railroads for up to 10% of the cost of the project if the railroads were benefited by the facilities.

The respondent filed suit in the Court of Claims seeking a refund on its 1955 income taxes, claiming that the Commissioner of Internal Revenue had erred by refusing to allow a depreciation deduction for these publicly contributed facilities. The respondent asserted that these facilities were "depreciable property" held throughout 1955 "for use in its trade or business," and that they were acquired prior to June 22, 1954, as "contributions to capital."

The respondent's claim was an uncomplicated one. Section 167 of the Internal Revenue Code of 1954, 26 U. S. C. § 167, applicable to the respondent's 1955 income tax return, allowed as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business . . . ." Section 1052 (c) of the 1954 Code, 26 U. S. C. § 1052 (c), provided for using the basis rules of the 1939 Code for certain property that was acquired in transactions to which the 1939 Code applied, including "contributions to capital." [1] The

---

[1] The basis provision of the 1954 Code, which provides a zero basis for nonshareholder contributions to capital, applies only to property acquired on or after June 22, 1954. 26 U. S. C. § 362. See n. 9,

respondent contended that the publicly contributed facilities were "contributions to capital," and that under § 113 (a)(8)(B) of the 1939 Code, it could carry over the transferor's basis; in short, it claimed that its basis for the highway-safety facilities was the cost of the facilities to the governments that had financed them.[2]

The Court of Claims agreed with the respondent that these facilities were exhaustible assets properly depreciable to the full extent of their value. 197 Ct. Cl. 264, 276, 455 F. 2d 993, 1002. The depreciable nature of the facilities was undisputed, since the Government conceded that "the facilities are of a character normally subject to allowance for depreciation and that to the extent they were paid for by [the respondent], appropriate depreciation deductions are proper." *Id.,* at 273–274, 455 F. 2d, at 999. The court concluded that the facilities were "contributions to capital" under § 113 (a)(8)(B) of the 1939 Code and that the Government's cost basis in the facilities was, therefore, available to the respondent.[3] "The facilities were constructed primarily for the benefit of the public to improve safety and to expedite motor-vehicle traffic flow. The record shows, however, that

*infra.* All the property at issue in the present case was acquired before June 22, 1954.

[2] Section 113 (a)(8) provides in pertinent part:

"If the property was acquired after December 31, 1920, by a corporation—

.        .        .        .        .

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."

[3] It was undisputed that the facilities had been "contributed" to the respondent by the States, "and this is taken to mean that [the respondent] owns them . . . ." 197 Ct. Cl. 264, 272, 455 F. 2d 993, 998.

[the respondent] received economic benefits from the facilities, *e. g.,* probable lower accident rates, reduced expenses of operating crossing equipment and, where permitted, higher train speed limits. [The respondent] also received intangible benefits, *e. g.,* goodwill from the community-at-large, which was to [the respondent's] long-term economic advantage." *Id.,* at 272, 455 F. 2d, at 998.[4] The court thus concluded "that the facilities enlarged [the respondent's] working capital and were used by [the respondent] in its business; and though they may not produce income to the same extent as other railroad property, such as track or freight cars, [the respondent] derived economic benefits from them." *Id.,* at 276, 455 F. 2d, at 1000.

I think the Court of Claims was entirely right in holding that these publicly contributed facilities constituted contributions to capital within the meaning of § 113 (a)(8)(B) of the 1939 Code.[5] The facilities at issue fall within the plain language of a "contribution to capital." As the Court noted, they were "contributed" to the respondent in the sense that the railroad now owns them.

---

[4] The Findings of Fact of the Trial Commissioner which were accepted by the court indicated as follows:

"The facilities . . . were constructed primarily for the benefit of the public to improve safety and to expedite highway traffic flow. [The respondent], however, received benefits from the facilities, among others, probable lower accident rates, reduced expenses of operating crossing facilities, and, where permitted, higher train speed limits, all of which permitted [the respondent] to function more efficiently and presumably less expensively." 197 Ct. Cl., at 326–327.

[5] The Government has suggested as an alternative basis for reversal that the respondent entered into a "terms letter" agreement with the Commissioner whereby it agreed to exclude contributed property from its depreciation base. The Court does not reach this contention. I agree with the reasoning of the Court of Claims in holding that the terms letter did not bar the respondent from claiming a depreciation deduction on contributed property.

And they are now part of the "capital" of the railroad
as that term is generally used in business and accounting
practice, part of the permanent investment in the busi-
ness. See *Brown Shoe Co.* v. *Commissioner,* 339 U. S.
583, 589 and n. 11; *Texas & Pacific R. Co.* v. *United
States,* 286 U. S. 285; *Edwards* v. *Cuba R. Co.,* 268 U. S.
628, 631–633; H. Guthmann & H. Dougall, Corporate
Financial Policy 136–138 (4th ed.); R. Marple, Capital
Surplus and Corporate Net Worth 136–137; 1 J. Mertens,
Law of Federal Income Taxation § 5.06 n. 47 (J. Malone
rev. ed.); Harvey, Some Indicia of Capital Transfers
Under the Federal Income Tax Laws, 37 Mich. L. Rev.
745, 747–749.[6]

The only two prior decisions of this Court that bear
directly on the question before us—*Detroit Edison Co.* v.
*Commissioner,* 319 U. S. 98, and *Brown Shoe Co.* v.
*Commissioner, supra*—confirm that these publicly con-
tributed facilities are contributions to the respondent's
capital.

In *Detroit Edison Co.* v. *Commissioner, supra,* prospec-
tive customers of an electric company were required to
pay for the construction of additional facilities in order

---

[6] The text of § 113 indicates that there is no significance in the
fact that the State and Federal Governments attempted here to
achieve the public goal of transportation safety rather than simply
to make a gratuitous transfer to the railroad. For if a donative
purpose were required for a "contribution to capital" then that pro-
vision would simply be duplicative of § 113 (a)(2) of the 1939 Code
which allows a carryover basis for gifts.

And similarly it is of no consequence that the contribution was
by a nonshareholder, for a contribution by a shareholder would have
a carryover basis under the "paid-in surplus" provision of § 113
(a)(8)(B). See Treas. Reg. 111, § 29.113 (a)(8)–1.

In short, a "contribution to capital" is any nongratuitous transfer
to a corporation by a nonshareholder, such as is involved in the
present case. See Freeman & Speiller, Tax Consequences of Subsidies
to Induce Business Location, 9 Tax L. Rev. 255, 261.

to receive the company's services. The Court rejected the contention that those payments were contributions to capital: "[I]t overtaxes imagination to regard the farmers and other customers who furnished these funds as makers either of donations or contributions to the Company. . . . The payments were to the customer the price of the service." *Id.*, at 102–103.

In *Brown Shoe, supra,* various community groups contributed cash and property to the taxpayer corporation to induce it to locate in or expand its operations in the respective communities. The Court held these assets to be "contributions to capital" within the meaning of § 113 (a)(8)(B), stressing the fact that they were in a very practical sense an addition to the corporation's capital: " '[T]he assets received . . . are being used by the taxpayer in the operation of its business. They will in time wear out, and if [the taxpayer] is to continue in business, the physical plant must eventually be replaced. Looking as they do toward business continuity, the Internal Revenue Code's depreciation provisions— and especially those which provide for a substituted rather than a cost basis—would seem to envision allowance of a depreciation deduction in situations like this. . . .' " *Id.*, at 590 (quoting *Commissioner* v. *McKay Products Corp.*, 178 F. 2d 639, 643). The Court explained *Detroit Edison* as a case of payments for services rather than contributions to capital. By contrast, in *Brown Shoe,* "[t]he contributions to [the taxpayer] were provided by citizens of the respective communities who neither sought nor could have anticipated any direct service or recompense whatever, their only expectation being that such contributions might prove advantageous to the community at large." *Id.*, at 591.[7]

---

[7] Federal courts in distinguishing between *Brown Shoe* and *Detroit Edison* have relied on the fact that *Detroit Edison* involved direct payments by customers for services. See *United Grocers, Ltd.* v.

It seems plain to me that the present case is controlled by *Brown Shoe*. As in that case, these publicly contributed facilities were in no sense direct payments for services. The State and Federal Governments did not purchase any services in connection with construction of the facilities. Rather, to achieve the public goal of transportation safety they transferred assets to the railroad which increased its working capital. In short, these assets fell within the practical, working definition of "contributions to capital" that was recognized by the Court in *Brown Shoe,* and they did not fall within the narrow exception of payments for services that the Court found significant in *Detroit Edison.*

The Government urges us to read *Brown Shoe* as holding that, in order to establish a "contribution to capital," a taxpayer must prove that the transferor of the asset had a definite purpose to enlarge the taxpayer's working capital. But that case did not turn on the presence of any such specific purpose. The purpose of the community contributions in *Brown Shoe* was to induce the taxpayer to locate or expand its operations in the local area, and this purpose was accomplished by contributing assets; there was no gratuitous attempt to enlarge the taxpayer's capital. The Court noted, in passing, the existence of a purpose to enlarge the taxpayer's working capital only in order to underline the fact that the community groups there were not customers paying compensation for services rendered. And, as in *Brown Shoe,* the State and Federal Governments here attempted to accomplish a general public goal by contributing facilities to the taxpayer. As in *Brown Shoe,* they were not paying for services.

---

*United States,* 308 F. 2d 634, 639–640; *Teleservice Co. v. Commissioner,* 254 F. 2d 105, 110–111. See also Note, Taxation of Nonshareholder Contributions to Corporate Capital, 82 Harv. L. Rev. 619, 626–627.

The Court today, however, does not appear to decide this case on the presence or absence of any specific motive, intent, or purpose. Rather, the Court constructs a series of guidelines that must be met before there can be a "contribution to capital." These guidelines seem to be based upon the value of the assets to the transferee. For the Court relies primarily on the fact that the publicly financed facilities were "peripheral" to the railroad's business and did not materially contribute to the production of further income, and concludes that they were not therefore contributions to the railroad's capital. But the Court cites nothing in the statute, the regulations, or our prior cases to warrant this strange definition of "capital" when that term is used in the phrase "contribution to capital."

*Brown Shoe* made clear that "capital" was to be defined "as that term has commonly been understood in both business and accounting practice . . . ." 339 U. S., at 589. The facilities in the present case meet that test. They are certainly part of the respondent's capital under any traditional understanding of that term; they are assets permanently invested in the railroad's business. See *supra,* at 421. Indeed, many of these facilities are essential to the railroad's continued operation—a railroad bridge, for example, is an obvious physical necessity if the railroad is to operate. All of the facilities enlarged the railroad's working capital, were used in its business, and yielded tangible and intangible economic benefits to the railroad. And the Court even appears to acknowledge that these assets are "capital" in the normal sense of that term, since it concedes that the portion of the facilities constructed by the railroad with its own funds is depreciable.[8] I do not understand why

---

[8] There is no dispute that the railroad can claim a depreciation deduction for its 10% share of the cost of the facilities.

that portion of the *same assets* that was contributed to the railroad is not also part of the railroad's capital. I would maintain the straightforward approach taken by *Brown Shoe* and *Detroit Edison*—nonshareholder additions to capital are "contributions to capital" unless they are direct payments for services rendered.

The Government argues that to allow the railroad to claim a depreciation deduction on these facilities as "contributions to capital" would lead to the "anomalous" result that although the railroad had incurred no expense with respect to the publicly financed facilities, it could nevertheless recoup their cost. But if this is an anomaly, it is the same anomaly that existed in *Brown Shoe*. The taxpayer there had not paid for the property contributed by the community groups, yet it was able to claim a full depreciation deduction on it. In short, this so-called anomaly is the ineluctable result of § 113 (a)(8)(B) which allowed a carryover basis for nonshareholder contributions to capital. It was Congress that had created the anomaly, and it was for Congress to correct it. In enacting § 362 (c) of the 1954 Code,[9]

---

[9] Section 362 of the Internal Revenue Code of 1954, 26 U. S. C. § 362, provides in pertinent part:

"(a) Property acquired by issuance of stock or as paid-in surplus.

"If property was acquired on or after June 22, 1954, by a corporation—

.　　　.　　　.　　　.　　　.

"(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

.　　　.　　　.　　　.　　　.

"(c) Special rule for certain contributions to capital.

"(1) Property other than money.

"Notwithstanding subsection (a)(2), if property other than money—

[*Footnote 9 continued on p. 426*]

Congress did precisely that. It eliminated any depreciation deduction for nonshareholder contributions to capital by providing a zero basis for such transfers, but it did so only for property acquired on or after June 22, 1954.

In sum, Congress in 1954 rewrote the tax law so as to overrule *Brown Shoe* and prohibit depreciation to be taken on contributions to capital made by nonshareholders on or after June 22, 1954.[10] As it now turns out, Congress could have saved itself the trouble. For today the Court rewrites the law and prohibits depreciation to be taken on such assets the railroad has owned since the 1930's. I would follow the law as Congress wrote it and affirm the judgment of the Court of Claims.

---

"(A) is acquired by a corporation, on or after June 22, 1954, as a contribution to capital, and

"(B) is not contributed by a shareholder as such,

"then the basis of such property shall be zero.

"(2) Money.

"Notwithstanding subsection (a)(2), if money—

"(A) is received by a corporation, on or after June 22, 1954, as a contribution to capital, and

"(B) is not contributed by a shareholder as such,

"then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution. The excess (if any) of the amount of such contribution over the amount of the reduction under the preceding sentence shall be applied to the reduction (as of the last day of the period specified in the preceding sentence) of the basis of any other property held by the taxpayer. The particular properties to which the reductions required by this paragraph shall be allocated shall be determined under regulations prescribed by the Secretary or his delegate."

[10] It was explicitly recognized that 26 U. S. C. § 362 (c) was enacted to overcome the effect of *Brown Shoe.* H. R. Rep. No. 1337, 83d Cong., 2d Sess., A128; S. Rep. No. 1622, 83d Cong., 2d Sess., 271–272; *Veterans Foundation* v. *Commissioner,* 317 F. 2d 456, 458.