MILLER, Judge:
This case is before the court on cross-motions for summary judgment. Petitioner, Springfield Street Railway Company (“Springfield”), seeks recovery of income taxes totaling $123,898 plus interest for its taxable years 1965 through 1969. The taxes and interest were assessed following audits by the Internal Revenue Service which added to Springfield’s income certain annual “grants”[1] made by the Commonwealth of Massachusetts through the State Treasurer pursuant to 2 Mass.Gen.Law Ann., ch. 58, § 25B, as follows:

Year accrued 

*

 Amount of grant

1965 $61,249
1966 72,369
1967 63,593
1968 63,928
1969 70,434
*A grant accrued in 1970 was taken into account for net operating loss carryback purposes.
Appropriate claims for refund were filed and disallowed, following which Springfield brought this action.
*701 Section 25B (added by St.1964, ch. 563) provides in pertinent part as follows:
The state tax commission shall, as hereinafter provided, certify to the state treasurer for payment, from that portion of the proceeds of the excise tax on cigarettes as authorized . . . the following:—
4c * sfc 4c 4c
(c) On or before April fifteenth of each year, the amount determined by the commission to be payable in accordance with this paragraph (c) to each common carrier of passengers by motor vehicle granted a certificate of public convenience and necessity . . . , such amount to be the sum of the following:-— (1) the motor vehicle excises paid by such . company . . . during the last preceding calendar year with respect to motor vehicles required to be registered by it . . . and operated under a certificate of public convenience and necessity . . -. ; (2) the fuel and special fuels excises paid by such . company . . . during the last preceding calendar year with respect to fuel and special fuels consumed in its operation of motor vehicles upon or over the highways of the commonwealth . over routes operated under a certificate of public convenience and necessity . . . The number of gallons of fuel or special fuels so consumed shall not exceed the number of miles that such motor vehicles have been operated during the last preceding calendar year . . . divided by five.
Springfield’s position is that the “grants” constituted contributions to the capital of a corporation under sec. 118, I.R.C.,[2] and were, therefore, excludable from gross income and subject to treatment as provided by sec. 362(c), I.R.C. Springfield, of course, has the burden of proof. Union Pacific R.R. v. United States, 524 F.2d 1343, 1382, 208 Ct.Cl. 1, 73 (1975), cert. denied, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 89 (1976).
The Government’s position is that the “grants” did not constitute contributions to capital and that the claims for refund were properly disallowed on either of two grounds: (1) that the accrued “grants” constituted a partial rebate of excise taxes, so that Springfield’s deduction for the full amount of its excise taxes had been overstated; or (2) that the accrued “grants” constituted additional gross income.
Springfield points out that from May 13, 1966 (the date on which the grant for 1965 was received) through May 17, 1971, it acquired fixed assets at an aggregate cost of $598,646, of which $544,447 was attributable to the acquisition of buses. However, this does no more than show that Springfield elected to use the grants it received to acquire capital assets. It does not sustain the burden of showing that the grants were contributions to capital by the Commonwealth of Massachusetts.
Springfield argues that “the public assistance . . . represented by the grants was intended [by the state legislature] to encourage the continuation, improvement and expansion of bus services to the general public.” It says:
They [the grants] were not made in payment for specific services rendered to the Commonwealth as the customer of Springfield, nor for any other compensatory purpose. Rather, the grants were made to benefit the public by assuring the continuance of mass transportation in and for communities serviced by private bus lines.
Obviously, grants made to assure continuation, improvement, and even expansion of services would not necessarily require that their expenditure be restricted to acquisition of capital assets. Springfield has pointed to no law or regulation that prevented the recipient of a grant from using it for wages and salaries, maintenance, insurance, administrative overhead, or other noncapital expenditure.
*702 In such a posture, this case is controlled by the rationale of Texas & Pacific Ry. v. United States, 286 U.S. 285, 52 S.Ct. 528, 76 L.Ed. 1108 (1932) and Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111 (1932) (both of which affirmed decisions of this court[3]), as refined by United States v. Chicago, B. & Q. R.R., 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973). In Texas & Pacific and in Continental, the question was whether federal government payments to railroads[4] under sections 209 and 204, respectively, of the Transportation Act of 1920 constituted taxable income. In holding that such payments were taxable income, the Supreme Court noted that the “underlying purpose of Congress” was the same in both cases, namely: as a “partial redress” for losses due to federal control and/or operation.[5] It said:
The sums received under the act were not subsidies or gifts — that is, contributions to the capital of the railroads, — and this fact distinguishes cases such as Edwards v. Cuba Railroad Co., 268 U.S. 628 [45 S.Ct. 614, 69 L.Ed. 1124] [1925], where the payments were conditioned upon construction work performed. Here they were to be measured by a deficiency in operating income, and might be used for the payment of dividends, of operating expenses, of capital charges, or for any other purpose within the corporate authority, just as any other operating revenue might be applied. [Emphasis supplied.] Texas & Pacific Ry. v. United States, supra at 289-90. See Baboquivari Cattle Co. v. Commissioner, 135 F.2d 114, 116 (9th Cir. 1943); Helvering v. Clairborne-Annapolis Ferry Co., 93 F.2d 875, 876 (4th Cir. 1938).
In Edwards v. Cuba R.R., 268 U.S. 628, 45 S.Ct. 614, 69 L.Ed. 1124 (1925), the Supreme Court had held that money subsidies (proportionate to mileage completed) paid by the Cuban government to promote construction of railroads in Cuba and used for capital expenditures were not taxable income, notwithstanding that the cost of construction carried on the books was not reduced by such payments.[6] The court said, supra at 632, 45 S.Ct. at 615:
The subsidy payments were proportionate to mileage completed; and this indicates a purpose to reimburse plaintiff for capital expenditures. . . . Neither the laws nor the contracts indicate that the money subsidies were to be used for the payment of dividends, interest or anything else properly chargeable to or payable out of earnings or income.
The latest guidance from the Supreme Court on the subject of nonshareholder contributions to capital is provided in United States v. Chicago, B. & Q. R.R., supra, 412 U.S. at 407-08, 93 S.Ct. 2169. After observing that it had “stressed the intent or motive of the transferor” rather than focusing upon the use to which transferred assets had been applied, and had determined the tax character of nonshareholder contributions by that intent or motive in Detroit Edison[7] and Brown Shoe[8] the Court recon- *703 died what it termed the seemingly inconsistent decisions in those cases “on the ground that in Detroit Edison the transfer- or intended no contribution to the transferee’s capital, whereas in Brown Shoe the transferors did have that intent.” Thus, the Court clearly affirmed the viability of the “intent of the transferor” test. At the same time, however, the Court recognized that more than evidence of a nonshareholder’s intent to make a capital contribution is required. It set forth “other characteristics of a contribution to capital” (emphasis supplied) which it said were implicit in Detroit Edison and Brown Shoe, namely: the contribution must become a permanent part of the transferee’s working capital structure; it may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee; it must be bargained for; the asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value; and the asset ordinarily will be employed in or contribute to the production of additional income. The Court then applied “this measure” in holding that the governmental subsidies in question[9] did not qualify as contributions to capital, so that the railroad could not claim a depreciation allowance with respect thereto.[10] In its discussion of the “it must be bargained for” characteristic, the Court, supra at 414, 93 S.Ct. at 2176, said:
The facilities were not in any real sense bargained for by CB&Q. Indeed, except for the orders by the state commissions and the governmental subsidies, the facilities most likely would not have been constructed at all. . . . The transaction in substance was unilateral: CB&Q would accept the facilities if the Government would require their construction and would pay for them. . As the Court of Claims found, the facilities were constructed “primarily for the benefit of the public to improve safety and to expedite highway traffic flow,” and the need of the railroad for capital funds was not considered, 455 F.2d 993 [1027], 197 Ct.Cl. [264], at 326 [footnotes omitted].
So, too, in this case, the grants to Springfield were not bargained for — they were unilateral and not conditioned upon Springfield’s use of them (or an equivalent amount of money) to acquire capital assets.
The above-described holding in Chicago, B. & Q. R.R. has been determined by this court to govern the treatment of transfers of various kinds in computing equity invested capital for excess profits tax purposes. Union Pacific R.R. v. United States, supra, 524 F.2d at 1376, 1378, 208 Ct.Cl. at 63, 65-66. Transfers for highway underpasses and other highway construction (in the interest of public convenience and safety) were held not to constitute contributions to capital. The court observed that the transfers involved in Edwards v. Cuba R.R., supra, were “utterly unlike those presently in question.” Numerous other governmental and nongovernmental transfers were “summarily disposed of in the light of the characteristics of a contribution to capital set out in Chicago, Burlington & Quincy R.R.” [11]
*704 In view of the foregoing, we hold that the grants in question did not constitute contributions to the capital of the taxpayer and, therefore, were includable in the taxpayer’s gross income.[12]
The Government’s motion is granted; Springfield’s motion is denied, and plaintiff’s petition is dismissed.

. Springfield, which was on the accrual basis of accounting, had excluded the grants from gross income (although it had treated them as “non-operating income” on its books), but had adjusted its depreciation deduction to reflect a reduction in the basis of its depreciable assets attributable to such grants, following sec. 362(c)(2), I.R.C., which provides in pertinent part:
[I]f money—
(A) is received by a corporation . as a contribution to capital, and
(B) is not contributed by a shareholder as such, then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution. The excess (if any) of the amount of such contribution over the amount of the reduction under the preceding sentence shall be applied to the reduction . of the basis of any other property held by the taxpayer.
References in this opinion to “I.R.C.” are to the Internal Revenue Code of 1954, as amended.

. Sec. 118(a) provided, during the taxable years in question:
(a) General Rule.
In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

. 52 F.2d 1040, 72 Ct.Cl. 629; 52 F.2d 1045, 72 Ct.Cl. 595.

. In Continental Tie & Lumber Co., Continental had filed a consolidated return with a small railroad company.

. Id. 286 U.S. at 294, 52 S.Ct. 528.

. As pointed out in United States v. Chicago, B. & Q. R.R., supra, this led to the seemingly anomalous result of a taxpayer receiving a contribution to capital free from income tax but being allowed to assert a deduction for depreciation on the capital item so received tax free; Congress responded by enacting the so-called “zero-basis provision,” sec. 362(c), I.R.C., supra note 1.

. Detroit Edison Co. v. Commissioner, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943). With respect to payments by certain customers for the cost of constructing facilities to provide them with service which otherwise would not have been made available, the Government was held warranted in adjusting the depreciation base to reflect the taxpayer’s net investment. The customers regarded the payments as the price of the service and had no intention of making a capital contribution.

. Brown Shoe Co. v. Commissioner, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (1950). Cash and buildings received from certain community groups as inducements to the location or expansion of the company’s manufacturing oper *703 ations in the communities held includable in computing equity invested capital for excess profits tax purposes, the purpose of the contributions being “to enlarge the working capital of the company.” The court noted, id. at 592, 70 S.Ct. 820, that the Treasury Regulations had placed the same interpretation upon the term “contribution to capital” for excess profits tax purposes as for income tax purposes.

. These were appropriated for “the benefit of public safety and improved highway traffic control” and were used by the railroad for highway undercrossings and overcrossings, crossing signals, signs, and floodlights, and jetties and bridges.

. The Court, supra, 412 U.S. at 408, 93 S.Ct. at 2173, stated: “Whether the governmental subsidies qualified as income to the railroad is an issue not raised in this case, and we intimate no opinion with respect to it.”

. Examples of such transfers held by this court to be contributions to capital: the sum of $1,076, paid by the Boise, Idaho, Chamber of Commerce for a railroad line from Orchard, Idaho, to Boise to provide through train service for Boise (the court observed that the transfer “was not a payment for a thing or a service, was bargained for, resulted in benefit to the transferee in an amount commensurate with its value, and the assets transferred were em *704 ployed in the production of further or additional income”); the sum of $28,338, contributed by a citizens right-of-way committee to obtain a more direct outlet to the California market and to open up copper mining properties for shipments (similarly treated by the court); and the sum of $100,000, paid by a citizens committee to acquire and transfer to Union Pacific a small railroad, which had ceased operations in consideration of Union Pacific’s promise to operate it permanently (similarly treated by the court). It should be noted that in these examples the intent of the transferor, as in Edwards v. Cuba R.R., supra, was that the contribution be used for a specific capital purpose and not that it be applied as the transferee desired.

. Springfield has advanced no other basis for not treating the grants as gross income within the broad definition of that term in sec. 61(a), I.R.C. See James v. United States, 366 U.S. 213, 219, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 430, 75 S.Ct. 473, 99 L.Ed. 483 (1955). Moreover, it is clear that Springfield received an income tax benefit from deducting the full amount of its excise taxes. As provided in section 25B and as recognized by Springfield in its brief, the grants were measured by those taxes; and the taxes were directly related to the mileage of transportation service furnished by Springfield to the general public and to the equipment it used in providing that service. We are satisfied that the grants were, in substance, a recovery of an expense of operations. Anders v. United States, 462 F.2d 1147, 199 Ct.Cl. 1, cert. denied, 409 U.S. 1064, 93 S.Ct. 557, 34 L.Ed.2d 517 (1972).