**MISSOURI PACIFIC RAILROAD COMPANY**

v.

**The UNITED STATES.**

**Nos. 142–67, 95–68.**

United States Court of Claims.

April 19, 1974.

See also 193 Ct.Cl. 257, 433 F.2d 1324.

Robert T. Molloy, Washington, D. C., atty. of record, for plaintiff; M. M. Hennelly, G. P. Strelinger, St. Louis, Mo., and Robert E. Simpson, Washington, D. C., of counsel.

Richard D. Silvester, Washington, D. C., with whom was Fred B. Ugast, Acting Asst. Atty. Gen., for defendant Philip R. Miller and Frances Foltz Kane, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DAVIS and BENNETT, Judges.

## ORDER

DAVIS, acting for the Chief Judge.

These cases come before the court on plaintiff's motion, filed March 4, 1974, pursuant to Rule 54(b)(3)(iii), moving that the court adopt, as the basis for its judgment in these cases, the recommended decision of Trial Judge George Willi, filed September 21, 1973, pursuant to Rule 134(h) as supplemented and revised by the "Trial Judge's Supplement and Revision of Prior Opinion", filed January 10, 1974. Upon consideration thereof, without oral argument, it appears that on March 11, 1974, the defendant filed a response to plaintiff's said motion stating that defendant has no objection to the allowance thereof but suggesting that the motion should rath-er have been filed under Rule 141(b). Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as supplemented and revised, copies of which have been furnished to the parties, it hereby grants plaintiff's said motion to adopt and adopts the said decision, as revised, as the basis for its judgment in these cases.

It is therefore ordered that plaintiff is entitled to recover on the Mexican tax credit issue, as set forth in the said decision, with the amount of recovery to be determined pursuant to Rule 131(c) and that the petitions are dismissed as to all other remaining causes of action and issues set forth therein.

## OPINION OF TRIAL JUDGE

WILLI, Trial Judge:

After two decisions by the full court on separate issues presented to it on motions for summary adjudication, a negotiated partial settlement and a formal concession by the plaintiff at the subsequent trial, four contested issues remain for disposition in these consolidated tax refund suits embracing the calendar years 1957 through 1961. Three of the issues involve the subsisting claims on which plaintiff brought suit and the fourth was injected by the Government as an additional defense in mitigation of any recovery otherwise found to be due the plaintiff.[1] The factual details of each of the several issues to be dealt with consecutively herein are contained in the findings of fact accompanying this opinion.

### Office Buildings

The question presented by this aspect of the litigation is whether the plaintiff sustained a loss cognizable for federal tax purposes in 1961 when, in that year, it consummated reciprocal transactions by which it conveyed its adjoining St. Louis headquarters and general office buildings to a real estate operator in that city and concurrently leased

1. Missouri Pac. R. R. v. United States, 338 F.2d 668, 168 Ct.Cl. 86 (1964).

them back from him for an initial term of 29 years and 11 months plus the right to renew for four additional periods of five years each.

On its 1961 return plaintiff claimed a deduction measured by the difference between $6,006,756.94, its adjusted tax basis in the property at the date of conveyance, and $5,035,943.10, the net cash proceeds that it received from the purchaser-lessor. It claimed the deduction[2] on the theory that its disposition of the property occasioned a recognizable loss. On audit, the Internal Revenue Service disallowed the deduction for 1961, viewing the disposition as an exchange of real estate for property of like kind (*i. e.*, the lease) within the scope of Section 1031(c) of the 1954 Internal Revenue Code, prohibiting loss recognition.[3] The Service treated the basis-proceeds differential, instead, as plaintiff's capital investment in the lease, to be amortized ratably over the full lease term, as authorized by Section 1031(d).

In this proceeding the Government not only denies that a sale occurred but contends that the Service erred in approving the leasehold amortization, saying that adjusted basis overstated the true tax value of what plaintiff conveyed and that therefore no amount was available for capital investment in the lease. For the reasons that follow, the Revenue Service's position, including its provision for amortization of leasehold premium, was correct.

In 1960 Edward Bakewell, a St. Louis realtor, approached plaintiff with a proposal to buy its central office buildings and lease them back for an extended term. The two adjoining buildings were well-suited to plaintiff's needs. They were then approximately thirty years old and were in excellent condition, having been well-maintained and modernized by the plaintiff. The idea of continued occupancy without the burdens of ownership appealed to plaintiff's management for several reasons. First, because of its labor contracts with various rail brotherhoods, it was committed to a pay scale for its building maintenance and service employees based on brotherhood wage rates which were significantly higher than those prevailing in the St. Louis area under the local union scale for office building employees. Second, a long-term lease stipulating a reasonably fixed rental charge would offer plaintiff

---

2. Section 1231(a) of the Internal Revenue Code of 1954, as amended, authorizes such a deduction where recognized losses exceed gains from sales or exchanges of business property of the character here involved.

3. The relevant portions of the statute are:
   § 1031. Exchange of property held for productive use or investment.
   (a) *Nonrecognition of gain or loss from exchanges solely in kind.*—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.
   * * * * *
   (c) *Loss from exchanges not solely in kind*\*—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section

1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain or loss, but also of other property or money, then no loss from the exchange shall be recognized.
   (d) *Basis* [as amended by Sec. 44(a), Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606].\*—If property was acquired on an exchange described in this section, section 1035(a), section 1036(a), or of section 1037(a), then the basis shall be the same as that of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized on such exchange. * * *
   \* Section 201(c) and (d) of the Act of September 22, 1959, P.L. 86–346, 73 Stat. 621, added the words "or of section 1037(a)" to Section 1031(c) and (d) above, effective for taxable years ending after September 22, 1959.

the assurance of an essentially predictable and stabilized cost of occupancy. Third, although the buildings were encumbered by a first mortgage covering plaintiff's fixed assets generally, it was felt that the mortgagee would release those properties from the deed of trust and permit plaintiff to use any funds realized from their disposition for general corporate purposes.

Extended and intensive negotiations of a strictly arm's length variety followed Bakewell's initial overture. It is important to note that at no time did either the plaintiff, Bakewell or any of the other prospective purchasers that approached plaintiff ever consider any arrangement under which plaintiff would surrender ownership of the buildings independent of a long-term lease-back of the property to it. Lease-back for an extended term was indispensable from plaintiff's standpoint because it was totally uninterested in relocating its general offices and from Bakewell's for credit reasons. Basic to his entire plan was the ability to secure full financing for the acquisition cost of the property. To accomplish this he was interested in maximizing borrowing power by generating as much collateral value as possible from within the proposed transaction itself. A reasonably profitable long-term lease with a responsible tenant such as plaintiff clearly qualified as a type of collateral that would give Bakewell the degree of borrowing leverage that he needed to achieve his objective of financing his entire acquisition cost by credit.

In early 1961, while negotiations were under way, plaintiff engaged a well-recognized St. Louis appraisal firm to determine the current fair market value of the physical property involved. Thus, plaintiff directed the appraiser to assume that the buildings were owned by someone other than itself (thereby obviating the maintenance and service wage constrictions emanating from brotherhood involvement); that the buildings were free and clear of any and all encumbrances (including leasehold interests); that the buildings were salable and carried marketable title, and that they were to be exposed for sale in the open market without contingencies or restrictions. Subject to these guidelines, the appraiser determined that the property had a fair market value of $4,500,000. The evidence adduced in this proceeding fairly supports that figure as the fair market value of the physical properties (i. e., the two adjoining buildings and the land on which they were situated).

By the early spring of 1961 negotiations with Bakewell in the format of a sale and lease-back had reached the point where plaintiff determined that it preferred his terms to those offered by other prospective buyers. All of the proposals made to plaintiff were structured on a sale and lease-back premise and all included a purchase price of approximately $5,000,000, the distinction among the several prospects being in the terms of the proposed lease-backs.

Finally, on April 29, 1961, Bakewell, who had meanwhile formed the solely-owned Fortune Holding Corporation exclusively for the conduct of this proposed undertaking, deposited with plaintiff a signed contract of purchase and concomitant lease-back of the subject buildings accompanied by a $100,000 earnest money payment. The contract called for a closing on August 25, 1961; specified a basic purchase price of $5,000,000, against which the earnest money was to be applied, and made the purchase expressly contingent on consummation of a lease agreement in substantial conformity with an appended proposed lease. Insofar as pertinent to the present controversy, the proposed lease provided: (1) an initial term of 29 years, 11 months at a basic annual rental of $904,500, subject to plaintiff's right to renew for four additional terms of five years each, the rent for any such extended term to be fixed on the basis of reimbursement for operating and maintenance expenses, taxes and insurance, plus $100,000 net annual return for ownership; (2) plaintiff to have the

right to sublet the leased premises; (3) plaintiff, during the initial term, to absorb one-half of any amount by which real estate tax liability on the property exceeds that for 1960; (4) plaintiff to pay any excess of Fortune's debt service and operating expenses over $904,500 annually, provided that should plaintiff be called upon to make such payments aggregating $100,000 during the life of the lease it could, for one dollar, reacquire title to the property free and clear of all encumbrances other than the first mortgage; (5) plaintiff to have the right to reacquire the property altogether free and clear, should the "owner of the fee" become bankrupt or insolvent by payment of $5,045,000 less one percent thereof for each year that had expired under the lease and provided that the entire amount of such payment be first applied to curtailment of the first mortgage debt; and (6) plaintiff to have an absolute option to reacquire the property free and clear (except for existing subtenancies) at any time after September 1, 1966 for $6,045,000.

Plaintiff signed the April 29 contract on May 26, 1961 and with firm commitments for both purchase and lease-back now in hand Bakewell, by Fortune, immediately turned his attention to obtaining the credit necessary to consummate the $5,000,000 purchase to which he was contractually committed. To that end he approached the New York Life Insurance Company for a long-term loan in the maximum amount that it would approve with the buildings as collateral. As the purchase and lease-back contract specifically authorized, Bakewell submitted a copy of the proposed lease to the insurance company for its use in arriving at a fair market value of the physical property as encumbered by such a lease. Because of the nature and extended term of the lease the insurance company's appraisal was based primarily on capitalization of the annual net income that Fortune might reasonably anticipate as lessor. Under this approach the appraisal indicated a fair market

value of $6,200,000 for the property as indentured by the lease. The appraiser concluded that this valuation was reasonably corroborated by the results obtained from valuing the land involved at $30 per square foot (a value generally comparable to that at which similar land in the area had changed hands) and the buildings'at replacement cost less depreciation. In any event, on the basis of this appraisal New York Life loaned Fortune $4,100,000 repayable ratably over a period of approximately 28 years. The loan was closed on August 25, 1961, the closing date for the purchase and lease-back between Fortune and plaintiff. Though the obligation was secured only by a first deed of trust on the real property, the trust indenture expressly required Fortune to maintain its lease with plaintiff in force and prohibited it from assigning any revenue thereunder except to Zilkha & Sons, a New York lender. Fortune financed the balance of the purchase price by obtaining a $1,000,000 loan from Zilkha secured by an assignment of Fortune's interest in the lease with plaintiff.

With the loan proceeds described above, Fortune closed its purchase from plaintiff on August 25, 1961 and the parties concurrently executed a lease substantially similar to that for which they had earlier contracted.

In assessing the parties' opposing contentions, it is important to note at the outset that the tax consequences of plaintiff's disposition of its buildings are not controlled by the fact that the transaction was totally conditioned on and interrelated to the companion lease-back. That the transactions were in fact reciprocal, as on this record they must be deemed, does not foreclose the occurrence of a viable sale for, federal tax purposes. City Investing Co., 38 T. C. 1 (1962); May Dep't Stores Co., 16 T.C. 547 (1951), and Standard Envelope Mfg. Co., 15 T.C. 41 (1950). Where such reciprocity is the fact, however, removal of the disposition transaction

from the nonrecognition constraints [4] of Section 1031 requires: (1) that the seller has relinquished effective control of the property; (2) that the lease is for a total term of no more than thirty years, inclusive of optional renewal periods; (3) that the consideration, apart from the lease, for the transfer is fairly equivalent to the market value of the property transferred; and (4) that the rental payments under the lease are reasonable compensation for use and occupancy of the desired premises. 5 Mertens, Law of Federal Income Taxation § 28.28a (1969 Rev.).

On the evidence presented, plaintiff passes muster as to some, but not all, of the above criteria.

First, the $5,045,000 cash payment that it received reasonably reflected the fair market value of the physical properties to·which it surrendered title, i. e., the properties free and clear and unencumbered by any lease.

Second, the annual rental of $904,500 that it paid under its lease-back bore a reasonable relationship to the value that it received as tenant.

Plaintiff founders, however, on both the 30-year ceiling on term and, more importantly, the requirement for surrender of control.

The Treasury Regulation [5] promulgated under Code Section 1031(c) specifies that an exchange of real estate for a leasehold of a fee with more than thirty years to run will be deemed an exchange of like kind property for purposes of that statute. This principle was first announced in Article 1572 of Treasury Regulation 65 interpreting Section 203(f) of the Revenue Act of 1924, c. 234, 43 Stat. 253, 257, the progenitor of the 1954 Code Section 1031(c), and has survived all intervening statutory reenactments. United States v. Correll, 389 U.S. 299, 305, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); Fribourg Nav. Co. v. Commissioner of Internal Revenue, 383 U.S. 272, 283, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966). The strong presumption of validity arising from this regulatory history is directly reinforced by the express approval given the regulation in Century Elec. Co. v. Commissioner of Internal Revenue, 192 F.2d 155, 160 (8th Cir. 1951), cert. denied, 342 U.S. 954, 72 S. Ct. 625, 96 L.Ed. 708 (1952), the precedent that the Government deems dispositive of the present controversy. There a manufacturer conveyed its foundry property to a local college for $150,000; that being approximately $50,000 less than the property's fair market value and more than $500,000 less than the manufacturer's adjusted tax basis in it. Concurrent with this transaction the manufacturer leased the foundry back from the college for a term varying, at the former's option, from 25 to 95 [6] years at a rental charge not disclosed by the opinion. After observing that the market value of the like

---

4. Nonrecognition of gain or loss is mandatory under the terms of Section 1031, not taxpayer-elective. Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652, 657 (5th Cir. 1968).

5. Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.) :

§ 1.1031(a)–1 *Property held for productive use in trade or business or for investment.*

\* \* \* \* \*

(c) No gain or loss is recognized if (1) a taxpayer exchanges property held for productive use in his trade or business, together with cash, for other property of like kind for the same use, such as a truck for a new truck or a passenger automobile for a new passenger automobile

to be used for a like purpose; or (2) a taxpayer who is not a dealer in real estate exchanges city real estate for a ranch or farm, or exchanges a leasehold of a fee with 30 years or more to run for real estate, or exchanges improved real estate for unimproved real estate; or (3) a taxpayer exchanges investment property and cash for investment property of a like kind.

6. For purposes of the 30-year principle the court viewed the lease term as the maximum period of tenancy available to the lessor as a matter of right, i. e., 95 years. 192 F.2d at 159. So it is that here the operative lease term is 49 years, 11 months rather than just the initial term of 29 years, 11 months.

kind property, *i. e.*, the lease, received in the exchange for realty, is irrelevant under the statute now denominated Section 1031(c), the court declared that before and after the reciprocal transactions the same property was held by the same taxpayer for the same use in the same business; that the only change wrought by the transactions was in the nature of the taxpayer's estate in the property: *viz,* from fee holder to a lessee for more than thirty years, which the regulation declares to be conclusively deemed like kind properties for purposes of the statute prohibiting loss recognition. 192 F. 2d at 159–160. The court did, however, agree with the Tax Court that the transferor-lessee was, by virtue of 1939 Code Section 113(a)(6),[7] entitled to capitalize the difference between the adjusted tax basis of the foundry property at the time of transfer and the $150,000 cash payment received and to amortize that differential amount over the term of the lease.

In 1957 the Tax Court had before it the question of whether a recognizable loss resulted from a sale of business property at a price equal to full fair market value, but substantially less than adjusted tax basis, where the sale transaction was integral to a lease-back of the property to the seller for a term of thirty years and three days at a fair value rental charge. Observing that the seller evinced no intention of surrendering possession of the property for use in its business, since remaining useful life at the time of the sale corresponded basically to the length of the lease (more than thirty years), the court deemed *Century Electric, supra,* controlling and therefore held that an exchange of like kind property (rather than a sale) had occurred as to which 1939 Code Section 112(e), the predecessor of 1954 Code Section 1031(c), denied loss recognition. Jordan Marsh Co., 16 CCH Tax Ct.Mem. 1094 (1957).

The Second Circuit reversed, finding *Century Electric* factually distinguishable. Jordan Marsh Co. v. Commissioner of Internal Revenue, 269 F.2d 453 (2d Cir. 1959). The court approached the problem as presenting an initial question of whether the taxpayer had sold the property or had exchanged it, in whole or in part, for the lease that it obtained. Accordingly, it reasoned, only if the transactions are deemed an exchange do you reach the issue of validity of the regulation, approved in *Century,* equating realty and a lease term of thirty years or more as like kind property for purposes of the statutes dealing with nonrecognition of losses. The court addressed the threshold inquiry by searching the legislative history of the ancestral nonrecognition provisions (originating in the Revenue Act of 1924) to ascertain Congress' intentions respecting the basic economic character of transactions to which nonrecognition should be accorded. It concluded that the focus was on reciprocal transfers which, though real in form, left a taxpayer's investment commitment essentially unchanged. The court perceived the legislative aim as withholding gain or loss recognition where the taxpayer's disposition of the property surrendered was so hedged that, in terms of economic reality, he had neither cashed in on a gain nor closed out a losing venture. Instead, he still had his money tied up in essentially the same kind of property.

With perspective thus derived, the court pinpointed those critical factual differences from *Century Electric, supra,* that accounted for opposite end-results within the framework of harmonious legal principle. Thus, it observed that in the earlier case "* * * notwithstanding the lengthy findings made with meticulous care by the Tax Court in that case, 15 T.C. 581, there was no finding that the cash received by the taxpayer was the full equivalent of the value of the fee which the taxpayer had conveyed to the vendee-lessor, and no finding that the lease back called for a rent which was fully equal to the rental

---

7. That provision was essentially reenacted as Section 1031(d) of the 1954 Code, *supra* n. 3.

value of the premises." 269 F.2d at 456–457. In contradistinction, the court recapitulated the undisputed facts before it as follows (269 F.2d at 453–454):

> The transactions giving rise to the dispute were conveyances by the petitioner in 1944 of the fee of two parcels of property in the city of Boston where the petitioner, then as now, operated a department store. In return for its conveyances the petitioner received $2,300,000 in cash which, concededly, represented the fair market value of the properties. *The conveyances were unconditional, without provision of any option to repurchase.* At the same time, the petitioner received back from the vendees leases of the same properties for terms of 30 years and 3 days, with options to renew for another 30 years if the petitioner-lessee should erect new buildings thereon. The vendees were in no way connected with the petitioner. The rentals to be paid under the leases concededly were full and normal rentals so that the leasehold interests which devolved upon the petitioner were of no capital value. [Emphasis added.]

In view of the independent adequacy of the consideration in money for both the transfer of the property and acquisition of the lease, the court concluded that on the facts before it the taxpayer-seller had by its unconditional conveyance[8] effectively "closed out a losing venture" by way of a sale rather than an exchange. The central importance to this rationale of the unconditional character of the conveyance, twice emphasized in the opinion, is indisputable. Had Jordan Marsh, as the plaintiff here, retained the right to reacquire the subject property in the near future and at a reasonable price, such a defeasible surrender of legal title could only have been deemed to mark the suspension of a losing venture, not the closing out of it.

Accordingly, the fact that the Revenue Service has formally noted its disinclination to follow the Second Circuit's decision in *Jordan Marsh* [9] is wholly extraneous to its impact on the present controversy. Indeed, the within opinion assumes the correctness, on its own facts, of that thorough, logical and well-reasoned holding. The same is true of the Tax Court's 1962 decision in City Investing Co., 38 T.C. 1 (1962), finding that a "sale" of land had occurred notwithstanding that in an interrelated transaction the seller leased it back for a term totaling, at its option, ninety-nine years. As in *Jordan Marsh, supra,* the facts disclosed a cash sales price equal to fair market value of the property and a reasonable rental charge under the lease. Importantly, the lease provisions conformed with the thesis that the sale was in implementation of the taxpayer's asserted policy of liquidating its real estate interests in the subject geographic area in that it gave the taxpayer " * * * no right to reacquire the land at any time by purchase or otherwise." 38 T.C. at 4.[10] In these circumstances the court found it unnecessary to consider the *Century Electric* decision, including the validity of the 30-year like kind Treasury Regulation upheld therein.

The Government points to several provisions of the lease agreement by which it contends plaintiff reserved various manifestations of control of the demised premises tantamount to that of a fee holder. Putting the implication of these contentions and considerations entirely aside, however, the fact that the expressly reserved right to repurchase the subject property at any time after five years from its conveyance for $6,045,000 is sufficient, standing alone, to deny that transaction the status of a sale on which loss may be recognized for federal tax purposes. Given such reacquisition privileges in the granter, no court has

---

8. 269 F.2d at 456.

9. Rev.Rul. 60–43, 1960–1 Cum.Bull. 687.

10. "Thirty conveyed its fee interest in the property without reserving any right of repurchase." 38 T.C. at 8.

found, directly or by implication, that a property sale on which loss might be recognized occurred.

■ Accordingly, plaintiff may not have a 1961 loss deduction for $970,813.84, the difference between the net cash proceeds that it received from Fortune and the adjusted basis of the property at the time. Instead, in accordance with Section 1031(d), *supra* n. 3, and consistent with the holding in *Century Electric*, that amount should be capitalized as plaintiff's cost of the lease that it obtained from Fortune and amortized ratably over a period of 49 years and 11 months, the term for which plaintiff secured occupancy rights thereunder. Should plaintiff in the interim elect to exercise its repurchase rights the unamortized portion of this capital cost will

become a part of its new basis in the property.

### Mexican Tax Credit

■ In Chicago, Burlington & Quincy R.R. v. United States, 455 F.2d 993, 197 Ct.Cl. 264 (1972), rev'd on other grounds [11] 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973), this court most recently [12] decided that amounts withheld by Mexican railroads from per diem rental paid a United States railroad for use of rail cars in Mexico, pursuant to the applicable provisions of the Income Tax Law of the Republic of Mexico, qualified for foreign tax treatment under Section 901 [13] of the Internal Revenue Code of 1954, as amended; subject, nevertheless, to the limitation imposed thereon by Section 904.[14]

11. As decided here, the case involved seven issues, including those concerning donated property, Mexican tax credit, welded rail and secondhand rail valuation. Certiorari was only sought with respect to the donated property issue and the Supreme Court's decision was limited accordingly.

12. *See also* Missouri-Illinois R. R. v. United States, 381 F.2d 1001, 180 Ct.Cl. 1179 (1967); Missouri Pacific R.R. v. United States, 301 F.Supp. 839 (E.D.Mo.1967), aff'd in part, rev'd in part and remanded, 411 F.2d 327 (8th Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 861, 24 L.Ed.2d 681 (1970).

13. In relevant part, Section 901 provides:
(a) *Allowance of credit.*—If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. The credit shall not be allowed against the tax imposed by section 56 (relating to minimum tax for tax preferences), against the tax imposed by section 531 (relating to the tax on accumulated earnings), against the additional tax imposed for the taxable year under section 1333 (relating to war loss recoveries) or under section 1351 (relating to recoveries of foreign

expropriation losses), or against the personal holding company tax imposed by section 541.
(b) *Amount allowed.*—Subject to the applicable limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):
(1) *Citizens and domestic corporations* —In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; and

\*      \*      \*      \*      \*

14. As applicable here, Section 904(a)(1) and companion Section 905 provide:
(1) *Per-country limitation.*—In the case of any taxpayer who does not elect the limitation provided by paragraph (2), the amount of the credit in respect of the tax paid or accrued to any foreign country or possession of the United States shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country or possession (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

\*      \*      \*      \*      \*

§ 905. Applicable rules

\*      \*      \*      \*      \*

(b) *Proof of credits.*—The credits provided in this subpart shall be allowed only if the taxpayer establishes to the satisfaction of the Secretary or his delegate—

In denying eligibility for the same treatment in the present litigation for similar withholdings from per diem income paid plaintiff and its subsidiary, The Texas & Pacific Railway (Texas & Pacific), during 1957 through 1961, the defendant candidly acknowledges that the factual setting is essentially the same as that on which the court ruled in *C. B. & Q., supra.* It says, however, that in the instant proceeding additional facts have been adduced showing that in reality no Mexican tax at all was imposed because the withheld levies were exacted pursuant to a tripartite agreement between the Republic of Mexico, the Government-owned railways of Mexico and the Association of American Railroads (AAR (representing United States and Canadian railroads)). The argument runs that employment of this method of implementation of the applicable taxing provisions of Mexican law had the practical effect of abdication of taxing authority by the Mexican Government to the AAR. While the contention may be new, the underlying facts are not. In this particular, as well as all others, the situation is identical to that presented in *C. B. & Q., supra.* Indeed, extended consideration and comment were directed in that decision to the same tripartite agreement. In any event, defendant has presented nothing to reasonably impugn the agreement as being other than a real and proper exercise of governmental taxing authority. That Mexico elected to appropriate the proceeds of the levies to the benefit of its domestic rail carriers does not mean that the sums involved were not collected from the plaintiff as a tax.

Aside from the unpersuasive attack described above, defendant quarrels only with plaintiff's calculation of the amount of its Mexican-source taxable income for purposes of the foreign tax credit limitation imposed by Section 904. The divergence results from variance in the amounts of expense that the parties contend were attributable to the production of Mexican per diem income. While the evidence indicates the plaintiff incurred certain types of expenses, *viz*, for the maintenance of freight traffic offices and for employees' accrued vacation pay, that were no doubt functionally related to the production of freight car rental income from Mexico, as well as income from rail operations generally, it is not sufficient to permit a reasonable attribution of a determinate amount of these expenses to Mexican car rental income. Accordingly, no part of these expenses can properly be reflected in the computation of Mexican-source income as determined for Section 904 credit limitation purposes.

Finally, defendant urges that plaintiff's income from rentals of freight cars in Mexico should be charged with a portion of the interest incurred on its general funded debt. The suggestion is without merit because in fact, both before and after plaintiff's 1956 reorganization, none of the freight cars that produced the rental revenue from Mexico were acquired with proceeds from the funded borrowings on which the interest charges were incurred. See Missouri Pac. R.R. v. United States, 392 F.2d 592, 605–606, 615, 183 Ct.Cl. 168, 187–188, 206 (1968).

### *Welded Rail*

The question in this connection is precisely as it was in *C. B. & Q., supra*; whether a railroad using the retirement-replacement-betterment method of accounting for its track account assets, including rail and other track material, may expense either the total cost

(1) the total amount of income derived from sources without the United States, determined as provided in part I,

(2) the amount of income derived from each country, the tax paid or accrued to which is claimed as a credit under this subpart, such amount to be determined under regulations prescribed by the Secretary or his delegate, and

(3) all other information necessary for the verification and computation of such credits.

\*   \*   \*   \*   \*

of welding or the cost of labor therefor to the extent that it replaces bolted rail with welded rail of like pattern weight. The answer depends on whether the welded rail joints are deemed a betterment of the bolted joints that they replaced.

Since the nature of the accounting method involved, singularly applicable to railroads it appears, has been fully and lucidly explained by this court in *C. B. & Q., supra,* 455 F.2d at 1005–1007, 197 Ct.Cl. at 284–287.[15] Only the bare fundamentals will be repeated here.

Under this composite method of depreciation accounting, the initial cost of installing track (which is the only type of asset that we are concerned with here) is capitalized. No ratable deduction for depreciation of such installation expenditures is thereafter allowed and no depreciation reserve is maintained with respect to them. Only when the track is replaced or permanently retired from service without being replaced is depreciation recorded. When the track is retired without replacement the full amount that had been capitalized for it is simply written out of the asset account and charged to operating expense. If the track is replaced in kind (rather than retired without replacement), the cost of the replacement is charged to current expense in an amount reduced by the value assigned the rail that is being replaced. The betterment facet of the overall method is related to that dealing with replacement. Thus, to the extent that a replacement functionally constitutes a betterment, the betterment portion is added to the capital account and the remaining portion of the replacement cost is charged to current expense. In the context of this method of depreciation accounting it is the annual aggregate of the charges to expense, as previously defined, that represents the taxpayer's depreciation deduction for such year.

The parties are in basic accord as to the meaning of a betterment. They agree that, consistent with Interstate Commerce Commission regulations, it is a replacement that effects a substantial functional improvement through the application of superior parts, the primary aim of which is to make the property affected more useful, more efficient, of greater durability or of greater capacity.

Accordingly, the dispositive issue is, as it was in *C. B. & Q., supra,* factual in character.

It appears that in *C. B. & Q.,* unlike the present controversy, the only evidence adduced bearing directly on the physical performance of welded rail was that pertaining to such rail as was installed on plaintiff's own lines. See 197 Ct.Cl. at 332–333. It was obviously in that context that the court registered the following observations and conclusions (455 F.2d at 1008–1009, 197 Ct.Cl. at 290–291):

> * * * Welded joints do not require maintenance like bolted joints; and in fact the record shows that during the first 12 years of service of welded rail (1955–1967), welded joints required no substantial maintenance at all. However, the record also shows that welded joints are not an unmixed blessing. About 1967, welded joints installed on plaintiff's main lines in 1955 exhibited serious wear and deterioration known as secondary batter. Secondary batter results from the fact that the fused metal at the weld is harder than the rail on either side of the weld. Thus, the joint wears less rapidly than the main rail. After extensive use and track wear, the metal adjacent either side of the weld tends to dish out as the wheels of railroad cars ride over the weld, *i. e.,* the wheels tend to batter the track downstream of the weld. Secondary batter becomes progressively worse with time and particularly if trains run both directions on the track. Though no maintenance to correct secondary batter was done by plaintiff

---

15. *See also* Rev.Rul. 67–22, 1967–1 Cum.Bull. 52.

between 1955 and 1967, the record shows that substantial maintenance will be required soon and that such maintenance will be necessary from time to time during the 40–50 year useful life of the rail. The maintenance will involve grinding down the track and weld to eliminate dished-out areas, or in extreme cases, cropping out the damaged areas and rewelding the rail ends.

Against these facts, it must be concluded that the record does not support defendant's position that welded joints vis-à-vis bolted joints constitute a "betterment" to the track system in terms of retirement-replacement-betterment accounting. * * * Thus, while the record shows that welded joints result in some advantages over bolted joints, the advantages are not *so* substantial and track system *so* improved that welded joints should be considered a betterment over bolted joints for purposes of retirement-replacement-betterment accounting. Plaintiff may therefore charge to current expense the cost of replacing bolted joints with welded joints, in the same proportion as it charges to current expense the cost of replacing the rail itself.

In contrast to the limited factual perspective provided the court in *C. B. & Q.*, the record in the present proceeding includes an illuminating and persuasive body of evidence dealing with the performance characteristics of welded rail generally. Accommodating that proof to the operating results obtained from the specific rail in issue convincingly suggests that its performance deficiencies were attributable to faulty fabrication and/or installation practice rather than any infirmity indigenous to the use of welded rail.

The factual details of welded, as contrasted with bolted rail technology and the general performance characteristics of each are set forth in the findings and will not be repeated herein.

The particular rail here involved was installed in three separate stretches in 1959 and 1960 by plaintiff's subsidiary, Texas & Pacific. The installations, each replacing existing bolted rail, totaled approximately sixty miles. For two of the segments, new 115-pound pattern weight rail was used. The third used 112-pound secondhand rail. Whereas standard practice contemplates fusion of 37 rails of standard 39-foot length to form a continuous member or so-called "stringer" 1,440 feet long, this rail was fused in stringers ranging from 156 to 654 feet in length. This fact, coupled with the absence of any evidence concerning the manner in which the rail in question was physically handled in the course of fabrication; how the constituent 39-foot rails were aligned for fusion; whether cooling of the welds was controlled; what welding specifications, if any, were employed, and how the stringers were transported from the point of plant fabrication to installation site, indicates that when Texas & Pacific made the three replacement installations in dispute it was relatively inexperienced in what for the rail industry generally was a comparatively new art and had not yet refined and perfected its techniques and practices respecting the use of welded rail.

The three Texas & Pacific installations were visually inspected in November 1971. Theretofore only routine maintenance had been performed on them. The inspection observations were varied. Of the two installations using new rail, one showed some primary batter, associated with depression at the point of rail fusion, and the other some secondary batter, caused by an inordinate elevation at that point. The installation utilizing secondhand rail showed some batter of each type. These conditions, it is noted, contrast sharply with the typical, if not uniform condition of secondary batter perceived in *C. B. & Q.* and attributed there [16] to the premise

16. At 455 F.2d 1008, 197 Ct.Cl. 290, the following statements appear: "Secondary bat-

ter results from the fact that the fused metal at the weld is harder than the rail on ei-

that the fused area of welded rail is intrinsically harder than that of the parent metal on either side. Moreover, although plaintiff's proof here showed that in some instances where secondary batter was found, the associated weld point was thought to be harder than the adjacent rail, its own engineering witness candidly acknowledged that such a condition is not inevitable; that the metal at the fusion point is not necessarily harder than that which adjoins it. Indeed, the clear purport of the evidence as a whole is that where proper fabrication technique is employed, the fused area does not vary appreciably in hardness from that of the parent metal on either side. Plaintiff's evidence did suggest a plausible explanation for at least some of the batter damage on the Texas & Pacific lines. The proof revealed that at some of the damage points the adjoining rails were either cambered or crowned at the welded joint. Significantly, the evidence showed that if rails are not properly aligned when welded together either a camber or a depression in the traffic surface at the weld area can result.

Finally, as to the Texas & Pacific rail, there is nothing in the evidence to suggest that any of the damage observed eleven or twelve years after installation was either manifest or reasonably foreseeable in the years when the installations were made.

In contrast to the results experienced with the sixty miles of welded rail installed by Texas & Pacific in 1959 and 1960, the record convincingly demonstrates that for the railroad industry at large, welded rail has generally performed with a marked superiority in durability, and consequent economy in maintenance expense, over the traditional bolted rail. The fact of that superiority is rooted more firmly than the mere logic implicit in the dramatic increase in industry usage of welded rail, from 550 miles in 1957 to almost 26,000 miles by the end of 1969. Parenthetically, this preference was shared by both the plaintiff and Texas & Pacific; the former having converted approximately 20 percent of its system to welded rail by 1970 and the latter approximately 25 percent by the same time.

The proof adduced included the direct observation and experience of a competent and fully experienced track engineer to the effect that welded rail, properly fabricated and installed, is significantly superior from an overall cost standpoint to bolted rail of a like pattern weight. This unimpeached testimony was directly supported by the results of a detailed four-year comparative operational study of welded and bolted rail by the well-respected American Railway Engineering Association.

In sum, the evidence in the present record, in contrast to that presented in *C. B. & Q.*, leaves no legitimate room for doubt that compared with bolted rail, welded rail is functionally a betterment, within the meaning of Rev.Rul. 67–22, 1967–1 Cum.Bull. 52, and relevant Interstate Commerce Commission regulations, in that it substantially reduces track renewal and maintenance costs.

As earlier indicated, the only reasonable hypothesis on which the relatively adverse results registered by the 1959 and 1960 Texas & Pacific installations can be squared with the distinctly contrary experience that has characterized welded rail generally, is that the Texas & Pacific installations, made in an era when general application of welded rail technology was in its comparative infancy, were the unfortunate victims of inadequate fabrication and/or installation technique.

In the final analysis, then, the question here resolves itself into that of determining whether an asset's classification as a betterment is to be determined

ther side of the weld. Thus, the joint wears less rapidly than the main rail. After extensive use and track wear, the metal adjacent either side of the weld tends to dish out as the wheels of railroad cars ride over the weld, *i. e.,* the wheels tend to batter the track downstream of the weld."

by the performance capabilities reasonably expected of it when placed in service or by the actual performance that it subsequently delivers in the course of that service, including performance deficiencies attributable to improper or substandard installation methods or practices.

While the retirement-replacement-betterment method of depreciation accounting differs importantly in certain implemental principles from the more conventional modes of calculating depreciation common to commercial enterprise generally, its ultimate overall objective is the same. Boston & Maine R.R. v. Commissioner of Internal Revenue, 206 F.2d 617 (1st Cir. 1953). Fundamental depreciation precepts are therefore not alien to it. Among those invariable principles are the related propositions (1) that in the absence of an express statutory prohibition, depreciation must be taken in the period sustained, commencing with the acquisition or erection of the property, and (2) that the annual allowance for depreciation is to be based on facts either known or reasonably ascertainable at the close of the year for which the allowance is taken.[17] 4 Mertens, Law of Federal Income Taxation §§ 23.01, 23.29 (1966 Rev.). Applying these tenets to the problem at hand requires that whether an asset installed to replace another constitutes a betterment be determined on the basis of facts known or reasonably ascertainable within the year of installation. In the case of the subject Texas & Pacific installations, the plaintiff's own evidence shows that it fully believed and anticipated that by replacing bolted rail with welded rail it was effecting a betterment. Thus, it freely concedes that at no time within the year of installation did it have any reason to think otherwise. Its position

is that only some ten or more years later did it become aware of the fact that its initial expectations might not be realized. Hindsight knowledge is not admissible to downgrade the assumed character and capability of an asset when installed; particularly where there is nothing to indicate that in general usage the type of asset involved did not fully justify those assumptions which, in this case, are the acknowledged hallmarks of a betterment.

The irrelevance of sub-standard performance attributable to faulty construction or installation to asset classification for depreciation purposes is evident from the accepted principle that the costs necessary to rectify defects stemming from such causes may not be deducted as current expenses but must be capitalized in the same manner as the original acquisition cost of the asset. Transport Mfg. & Equip. Co. v. Commissioner of Internal Revenue, 434 F.2d 373, 377–378 (8th Cir. 1970); M. P. Barfield, 11 CCH Tax Ct.Mem. 476 (1952).

As a corollary to the capitalization requirement implicit in the recognition of welded rail as a betterment of the jointed rail that it replaces, the retirement-replacement-betterment method of accounting contemplates that the unrecovered capitalized costs (including the original labor cost of installation) of the joint bars, bolts and other displaced track materials, less the respective salvage values of such items, are to be expensed for federal tax purposes. Rev. Rul. 67–22, 1967–1 Cum.Bull. 52, 54.

### Secondhand Rail

■ The final issue remaining for consideration concerns the value [18] to be

---

17. Johnson v. Commissioner of Internal Revenue, 302 F.2d 86 (4th Cir.), cert. denied, 371 U.S. 904, 83 S.Ct. 206, 9 L.Ed.2d 164 (1962).

18. Though the parties and the relevant Treasury Regulations (Rev.Rul. 67–22, 1967–1 Cum.Bull. 52 and Rev.Rul. 67–145, 1967–1

Cum.Bull. 54) frequently refer to this element as "salvage value," such designation is only accurate as applied in the limited context of the stretch of track involved in a particular rail replacement transaction. Thus, it is only as to that specific segment of track that the rail removed and held for subsequent reuse elsewhere in the carrier's

assigned rail removed by the plaintiff and Texas & Pacific from their respective track systems and subsequently reinstalled elsewhere in those systems as betterments, as distinguished from mere replacements, or additions; the construction of rail lines where none existed before.

Except for a subsidiary question to be later discussed, the issue as presented here is both factually and legally indistinguishable from that considered and decided in the Government's favor in Chicago, Burlington & Quincy R.R. v. United States, 455 F.2d at 1010–1014, 197 Ct.Cl. at 292–299. Understandably, the plaintiff's arguments are essentially a reiteration of those advanced by the same counsel and rejected by the court in *C. B. & Q.* As there, the issue was first injected into this proceeding as an additional defense set up in the defendant's answer. Its potential impact on the judgment to be entered herein is therefore limited to mitigation of any recovery otherwise found to be due the plaintiff.

On the merits, the question is, as it was in the prior suit, whether rail that is picked up by a carrier and retained by it for future reuse in the construction of a track addition or betterment should be valued at its fair market value at the time that it is picked up or at its original cost appropriately reduced to reflect the wear that it has undergone. As a result of the inflationary trend that has typified modern times, current market value generally exceeds the adjusted historical cost of the same rail; in this case by well over 50 percent.

As is apparent from the earlier mention of the basic attributes of the retirement-replacement-betterment method of depreciation accounting, the immediate impact of the differential in results produced by the two approaches to valuation of secondhand rail is reflected in the extent to which the carrier is permitted to currently deduct the cost of installing the rail that displaces that which is picked up and retained. It will be recalled that under this method it is that deduction that defines the carrier's depreciation allowance for the year in which the installation expense is incurred. To the degree that the carrier's costs of replacing a stretch of track are reduced to reflect the value of the rail that is replaced, the depreciation allowance arising from the transaction is reduced accordingly. Thus, the higher the value assigned to the replaced rail, the more the resulting depreciation allowance is reduced. Of course, the replaced rail prospectively retains whatever value is assigned. To the extent that it is later used in an addition or betterment, that value is only recoverable by the carrier, however, when the new installation is permanently retired.

As earlier indicated herein, perspective is all-important in determining the propriety of valuing retained used rail by displacing historical cost considerations with current market values. That approach is logically proper when cognizance is limited to the particular transaction by which the subject rail is removed from a segment of track. From the standpoint of that transaction, removal of the rail and its consignment to general inventory amounts to a disposition sufficient to justify inquiry into market value at that time. However long the rail may be used elsewhere in the future, its life with the track segment from which it was removed has permanently ended. Thus, for purposes of closing the transaction by which the subject rail became available for future use, realism requires the assignment of value at cur-

---

system can be said to meet the established tax definition of salvage, *viz*, an asset that is no longer useful in the taxpayer's trade or business and is therefore retired from service. Massey Motors, Inc. v. United States, 364 U.S. 92, 97–101, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). In the context of

plaintiff's track system at large, the rail with which we are here concerned was classified as quite the opposite of salvage; it was retained because the plaintiff determined that it would be useful in the construction of additions or betterments elsewhere in the system.

rent market in accordance with Rev.Rul. 67-145, 1967-1 Cum.Bull. 54. Moreover, plaintiff presents nothing to support a contrary view that was not urged upon the court in *C. B. & Q.*, as reflected by its detailed opinion therein. There is accordingly no warrant for a departure from the earlier holding.

■ The subsidiary point remaining for disposition is the defendant's contention that because plaintiff contested the depreciation disallowances for 1957 through 1961 resulting from upward revision of secondhand rail value it should be denied the 20-year amortization privileges accorded such disallowances by Rev.Proc. 68-46 1968-2 Cum.Bull. 961. According to its explicit terms, the purpose of that pronouncement was simply " * * * to provide a procedure to make necessary adjustments for tax purposes, to values of recovered railroad track materials in adjusting allowances for depreciation in accordance with Revenue Ruling 67-145, C.B. 1967-1, 54, for taxable years that ended prior to May 8, 1967 (the date when Revenue Ruling 67-145 was published in the Internal Revenue Bulletin)." In short, absolutely nothing said or implied elsewhere in that official procedural guide suggests that the 20-year write-off of tax adjustments resulting from revaluation of secondhand rail are either to be extended as a reward or withheld as a punishment. Additionally, whatever the abstract plausibility of defendant's suggestion that the amortization feature of Rev.Proc. 68-46 was intended as an inducement to taxpayers to accept administrative settlement of secondhand rail valuation questions, it loses appeal when applied to a situation where valuation was never questioned administratively and was first challenged in pleadings that otherwise did not touch the matter at all.

Since plaintiff's secondhand rail has been revalued herein in accordance with the principles of Rev.Rul. 67-147, it is entitled to the amortization privileges extended taxpayers so situated by Rev. Proc. 68-46.

*Summary*

Plaintiff is not entitled to a 1961 loss deduction in respect to the sale and lease-back of its office buildings in that year. It is entitled, however, to amortize over a period of 49 years and 11 months the difference between the net cash proceeds received for conveyance of legal title to its building property and the adjusted basis of that property at the time of conveyance.

Subject to the limitations of Section 904 of the Internal Revenue Code of 1954, to be determined after and in the light of final resolution of all substantive issues involved in this litigation, plaintiff is entitled to a foreign tax credit in respect to amounts withheld by or on behalf of the Republic of Mexico from per diem car rentals due it for freight cars operated in Mexico during 1957 through 1961.

Since the welded rail installed in 1959 and 1960 by plaintiff's subsidiary, Texas & Pacific, represented a betterment of that which it replaced, the total cost of the welding involved, including the labor component thereof, must be capitalized.

Rail replaced in 1957 through 1961 and held for future use in additions or betterments must be valued at current market price, approximated herein as halfway between that of new rail and scrap, with the depreciation allowance for those years to be adjusted accordingly, provided, however, that the amount of such depreciation adjustment may, to the extent that it effects a reduction in the tax overpayments otherwise determined in this litigation, be amortized over future years in accordance with the directives of Rev.Proc. 68-46, 1968-2 Cum.Bull. 961.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the opinion herein, the court concludes as a matter of law that plaintiff is entitled to recover on the Mexican tax credit issue, as set forth in the decision, with the

amount of recovery to be determined pursuant to Rule 131(c) and the petitions are dismissed as to all other remaining causes of action and issues set forth therein.